**In the Matter of the Arbitration between PRUDENTIAL LINES, INC.,**
Petitioner-Appellee,

and

**EXXON CORPORATION,**
Respondent-Appellant.

No. 191, Docket 82–7330.

United States Court of Appeals,
Second Circuit.

Argued Oct. 14, 1982.

Decided March 28, 1983.

David A. Nourse, New York City (Nourse & Bowles, New York City, of counsel; John P. Sandercock, Kirlin, Campbell & Keating, New York City, on brief), for respondent-appellant.

William C. Clarke, New York City (Charles W. Gerber, Barrett, Smith, Schapiro, Simon & Armstrong, New York City, of counsel), for petitioner-appellee.

Before VAN GRAAFEILAND and PIERCE, Circuit Judges, and WYATT,* District Judge.

PIERCE, Circuit Judge:

Exxon Corporation (Exxon) appeals from an order by Judge Charles S. Haight in the United States District Court for the Southern District of New York entered on April 1, 1982.[1] The order compelled Exxon to arbitrate a contract dispute involving $2,177,751 in alleged damages pursuant to the United States Arbitration Act, 9 U.S.C. § 4 (1976) (the Act), with Prudential Lines, Inc. (Prudential), a United States-flag steamship line. For the reasons stated below, we affirm the district court's order.

I

Prudential is a Delaware corporation with its principal place of business in the Southern District of New York; Exxon is a New Jersey corporation having offices in the Southern District of New York. The jurisdiction of this Court is based upon the provisions of the United States Arbitration Act, 9 U.S.C. § 4 (1976), and the maritime subject matter, 28 U.S.C. § 1333 (1976). On November 22, 1961, Prudential "bareboat" chartered its vessel for a 15 year term commencing with the date of delivery to Exxon.[2] The vessel was delivered to Exxon in May, 1964 and redelivery was to be made in

---

* The Honorable Inzer B. Wyatt of the United States District Court for the Southern District of New York, sitting by designation.

1. Reported below at 535 F.Supp. 292 (S.D.N.Y. 1982).

2. The names of the owner and the charterer in the charter party are those of the litigants' corporate predecessors. For purposes of this appeal, Prudential shall be considered the owner and Exxon the charterer.

May, 1979. Under Clause 7 of the agreement, Exxon was to have full control over the vessel during the term of the charter.

At the end of the term, Exxon was to redeliver the vessel to Prudential pursuant to the instructions set forth in Clause 16 of the charter party. Clause 16(a) required Exxon to redeliver the vessel in as good order as it was at the time of delivery to Exxon, except for damage resulting from ordinary wear and tear. Clause 16(b) called for a joint survey of the vessel at the time of redelivery "on drydock and afloat" by representatives of the two parties and required that "[s]uch representatives by an instrument in writing shall jointly agree upon and designate the repairs or work necessary to place the vessel on the date of redelivery in the condition required by this Clause 16." Clause 16(c) required the charterer to perform all necessary repairs prior to redelivery or, at the owner's option and with the consent of the Mortgagee of the vessel, to discharge such responsibility by payment for the repairs and lost time to the owner. Clause 16(d) provided that "[a]cceptance of the vessel by Owner shall be conclusive evidence of Charterer's compliance with any and all of the Charterer's obligations under this charter with respect to the vessel's class and condition at the time of redelivery."

Also relevant to this litigation were the arbitration provisions of the charter, Clauses 13(d) and 25. Clause 13(d) provided in part:

> Should any dispute arise between the Owner and the Charterer in respect to the responsibility for repairs, renewals or replacements, or as to the condition of the vessel at the time of redelivery, the matter shall be decided by arbitration as provided in Clause 25.

Clause 25 provided:

> Should any dispute arise under this agreement, the matter in dispute shall be referred to three persons, one to be appointed by Owner, one by Charterer, and the third by the two so chosen; and their decision or that of any two of them shall be final, and their award may be made a rule of court and a judgment or decree entered thereon.

In 1979, when the term of the charter was about to end, the owner Prudential appointed Carter Morrell, an independent marine surveyor, to conduct the survey on its behalf in compliance with the requirements of Clause 16(b). Morrell was a naval architect and marine engineer who had supervised the construction of the vessel, had worked as a consultant to Prudential, and had assisted in making a survey of the vessel in 1975. Morrell attended the vessel at the redelivery port, and participated in the joint survey in May, 1979.

Numerous factual claims are made by both parties as to events surrounding the redelivery of the vessel. Since the district court was deciding whether to compel arbitration and not the merits of the parties' claims, it made no findings of fact in this regard in its decision entered April 1, 1982. The court did note, however, that at the redelivery port, Prudential's representative, Morrell, executed a written "Certificate of Acceptance and Redelivery." During the period between May 25, 1979 and August, 1979, Exxon alleges that the vessel was in Prudential's sole control.

Exxon argues that execution of this certificate by Morrell in light of Clause 16(d), described above, constituted acceptance of the vessel. Thus, any claim for damage that Prudential as owner might have had against Exxon was allegedly extinguished by this "acceptance" of the vessel under Clause 16(d).

Prudential states that after May 25, 1979, it learned that anticipated repairs would cost more than $1,000,000 and on March 18, 1980, submitted a claim to Exxon for $2,177,751. Exxon refused to pay. On January 23, 1981, Prudential demanded arbitration of the dispute and subsequently designated an arbitrator, as required by the charter party. Exxon failed to reciprocate, as required by Clause 25. On May 18, 1981, Prudential filed its petition in the district court for an order to compel arbitration of its claim.

In a memorandum opinion and order dated June 17, 1981, Judge Haight initially denied Prudential's petition to compel arbitration. He found that Prudential had accepted the vessel, and held "[t]hat acceptance constitutes 'conclusive evidence' of respondent's compliance with those very obligations whose alleged breach petitioner now seeks to submit to arbitration. But the issue is foreclosed, and nothing remains to be arbitrated." The court also rejected Prudential's argument that Morrell was not authorized to accept the vessel and held that Prudential had "clothed" him with apparent authority.

Prudential filed a motion for reconsideration which was granted by the district judge on September 9, 1981 to further consider the question of whether the authority *vel non,* actual or apparent, of petitioner's surveyor to execute the certificate of redelivery was an arbitrable dispute. Upon reconsideration, Judge Haight entered a decision on April 1, 1982, and noted that the briefs and oral arguments focused on whether the issue of Morrell's authority was collateral to the agreement between the parties or " 'inextricably tied up with the merits of the underlying dispute,' and thus 'wholly derivative of issues that fall within the scope of the arbitration clause.' " 535 F.Supp. at 293, *quoting McAllister Bros. v. A & S Transp. Co.,* 621 F.2d 519, 523 (2d Cir.1980). In reversing his earlier decision, he concluded that the issue of Morrell's authority was not collateral. He noted that in his earlier decision, he had erroneously "assumed without analysis that the issue of the surveyor's authority could be decided by the Court on the motion papers, and need not be submitted to the arbitrators." 535 F.Supp. at 293.

Exxon filed a notice of appeal on April 27, 1982 and moved for a stay pending appeal pursuant to Fed.R.Civ.P. 62(d) and Rule 42 of the Civil Rules of the Southern District of New York, when Prudential demanded that Exxon proceed with arbitration despite the pending appeal. By an order entered May 25, 1982, the district court denied the motion. On appeal of the denial of that motion, a stay was granted by this court on June 15, 1982, on condition that Exxon file a bond or other security in an amount the district court deemed proper on remand.

## II

The issue presented herein is whether the district court erred in granting Prudential's petition to compel arbitration. In particular, we must review the district court's decision that the dispute over the responsibility for repairs, and sub-issues encompassed within the main dispute, were arbitrable.[3] In light of the persuasive dissenting opinion of Judge Wyatt, we shall also address the serious equitable considerations presented herein.

## III

This action was brought pursuant to the United States Arbitration Act, 9 U.S.C. § 4 (1976), which provides in part that:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement .... The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.[4]

---

**3.** We note that the district court focused mainly on whether the issue of Morrell's authority was arbitrable. Several other sub-issues are raised by Exxon on this appeal. See text *infra,* at 64.

**4.** In *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403, 87 S.Ct. 1801, 1806, 18

L.Ed.2d 1270 (1967), the Supreme Court elaborated on the limitations provided by Section 4. The Court stated: "Under § 4, with respect to a matter within the jurisdiction of the federal courts save for the existence of an arbitration clause, the federal court is instructed to order

Thus, under Section 4, it must be established that: (1) an arbitration agreement exists; (2) the dispute falls within the scope of the arbitration agreement (i.e., "under a written agreement for arbitration"); and (3) the dispute does not involve the making of the agreement or the failure to comply therewith.

Here, there is no dispute concerning the first requirement of Section 4. As noted above, two clauses of the charter provided for arbitration. Nor is there any disagreement regarding the third requirement since Exxon contests neither the making of the agreement nor that it has refused to arbitrate the dispute with Prudential over a matter covered by the arbitration clauses of the charter party. *See Mercury Constr. Corp. v. Moses H. Cone Memorial Hosp.,* 656 F.2d 933, 942 (4th Cir.1981) (en banc), *cert. granted,* 455 U.S. 937, 102 S.Ct. 1426, 71 L.Ed.2d 647 (1982). There is, however, disagreement between the parties as to whether the dispute falls within the purview of the agreement in light of the sequence of events which occurred herein. Before discussing this issue, it is helpful to state the applicable law regarding the scope of coverage of an arbitration agreement.

■ As we noted in *McAllister,* 621 F.2d at 522, " 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " (*quoting United Steelworkers of Am. v. Warrior and Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)). The question of whether a dispute between the parties is covered by the arbitration agreement is for the courts to decide. *Galt v. Libbey-Owens-Ford Glass Co.,* 376 F.2d 711, 714 (7th Cir.1967); *see Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 1581 (1962) (under Section 301 of the Labor Management Relations Act, the courts must decide whether a party has breached his promise to arbitrate).

Since adoption of the United States Arbitration Act, American jurisprudence has favored the arbitrability of disputes whenever parties contractually provide for arbitration. *See Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 510–11, 94 S.Ct. 2449, 2452–53, 41 L.Ed.2d 270 (1974). The legislative history of the United States Arbitration Act indicates that the Act was designed to avoid "the costliness and delays of litigation," and to place arbitration agreements "upon the same footing as other contracts . . . ." H.R.Rep. No. 96, 68th Cong., 1st Sess., 1, 2 (1924); *see also* S.Rep. No. 536, 68th Cong., 1st Sess. (1924). Moreover, the arbitrators appointed by the parties are presumably specialists, familiar not only with the relevant statutory and common law but also with custom and usage of the trade. *Federal Commerce & Navigation Co. v. Kanematsu-Gosho, Ltd.,* 457 F.2d 387, 389–90 (2d Cir.1972). Use of arbitration procedures also eases the workload of the courts. *Conticommodity Serv. Inc. v. Philipp & Lion,* 613 F.2d 1222, 1224 (2d Cir.1980). For these reasons, courts have consistently held that doubts about arbitrability should be resolved in favor of arbitration. *E.g., Galt,* 376 F.2d at 714; *World Brilliance Corp. v. Bethlehem Steel Co.,* 342 F.2d 362, 365 (2d Cir.1965).

With this presumption in mind, a court must examine the second requirement of Section 4, namely, the scope of the agreement to arbitrate. Two inquiries must be made by the district court at the outset: (1) is the arbitration agreement broad or narrow?; (2) if narrow, does the dispute involve a "collateral" agreement?

■ With respect to the broad or narrow query, we stated in *McAllister:*

If the arbitration clause is broad and arguably covers disputes concerning contract termination, arbitration should be compelled and the arbitrator should decide any claim that the arbitration agreement, because of substantive or temporal limitations, does not cover the underlying

---

arbitration to proceed once it is satisfied that 'the making of the agreement for arbitration or the failure to comply [with the arbitration

agreement] is not in issue.' " (footnote omitted).

dispute .... However, ... when "dealing with a narrower arbitration clause, ... it will be proper to consider whether the conduct in issue is on its face within the purview of the clause." Hence, if the arbitration agreement cannot reasonably be construed to cover disputes over whether the contract was in force during the relevant period, arbitration need not be compelled.

621 F.2d at 522 (citations omitted). Simply stated, a court should compel arbitration, and permit the arbitrator to decide whether the dispute falls within the clause, if the clause is "broad." In contrast, if the clause is "narrow," arbitration should not be compelled unless the court determines that the dispute falls within the clause. Specific words or phrases alone may not be determinative although words of limitation would indicate a narrower clause. The tone of the clause as a whole must be considered.

■ Here, as we have noted above, the charter party included two provisions for arbitration. The court below observed that clause 13(d) appeared to be "broad" while clause 25 appeared to be "narrow." 535 F.Supp. at 295. We disagree. We believe that both clauses contain sufficient words of limitation so that they must be construed to be "narrow." [5] Nonetheless, the district court properly addressed the question of whether the dispute fell within either or both of these clauses before issuing an order to compel arbitration. *Id.* The court correctly concluded that Prudential's claim arises "under" the agreement and is arbitrable.

■ To make this determination, a district court must turn to the second inquiry, which is whether the dispute involves a "collateral" agreement. A "collateral" agreement is a separate, side agreement, connected with the principal contract which contains the arbitration clause. The burden is on the party resisting arbitration to demonstrate that the disputed issue is collateral.

If a dispute arises under a collateral agreement, arbitration of that dispute cannot be compelled merely based upon the existence of an arbitration clause in the main agreement. *Rochdale Village, Inc. v. Public Serv. Employees Union, Local No. 80,* 605 F.2d 1290, 1296–97 (2d Cir.1979). For example, in *Rochdale,* we noted that if a dispute over contract termination was based on the theory that the contract had expired by its own terms, then the dispute was arbitrable because it required an interpretation of the contract's own terms. If, however, the contract had been terminated by a separate, collateral agreement, the dispute over termination would not be arbitrable because it could not reasonably be classified as an issue arising "under" the original contract.

It is important to note the difference between a dispute arising under a collateral agreement and one which arises under the main agreement but requires determination of a sub-issue. The latter, in the words of *McAllister,* is one which is "inextricably tied up with the merits of the underlying dispute," 621 F.2d at 523, and *is* arbitrable. Here, the main issue before us is whether the district court erred in granting a petition to compel arbitration between Prudential and Exxon concerning responsibility for repairs to the vessel. Resolution of this dispute necessarily implicates resolution of several sub-issues, including: (1) whether Prudential's claim for damages was extinguished by the operation of Clause 16; (2) whether Prudential's marine surveyor was authorized to "accept" the vessel; (3) what acts would constitute an "acceptance" of the vessel by Prudential sufficient to meet the Clause 16(d) requirement.

We conclude that none of these sub-issues involves a collateral agreement. Rather, as the district court concluded, each of these issues "is inextricably tied up with the merits of the underlying dispute," and "wholly derivative of issues that fall within the

---

**5.** The arbitration provision in Clause 13(d) is specifically limited to disputes regarding "responsibility for repairs, renewals or replacements, or as to the condition of the vessel at the time of redelivery." The arbitration provision in Clause 25 pertains to disputes that "arise under" the charter agreement.

scope of the arbitration clause," *McAllister,* 621 F.2d at 523, and therefore is within the scope of the arbitration clauses of the charter party. The district court was correct in so holding.

### IV

The dissenting opinion expresses concern over Prudential's conduct, delay and consequent prejudice to Exxon in bringing this action, which appears to have significantly benefitted Prudential while at the same time placing Exxon in a position of serious disadvantage. Judge Wyatt asserts that the charter, *inter alia,* required either that the parties, through their surveyors, agree on all repairs for which the charterer was responsible or demand arbitration as to responsibility for repairs *before* redelivery. Judge Wyatt asserts that such a requirement:

> recognizes the importance of establishing *at the time of redelivery* the then condition of the vessel rather than to delay this determination to some later date when the condition of the vessel will have been changed by operations of the owner, or of new charterers, or by the mere passage of time.

(at 67). Here, the vessel was redelivered on May 25, 1979, but a claim for the cost of repairs was not made until 10 months later, on March 18, 1980, and a demand for arbitration was not made until 1 year and 8 months after redelivery, on January 23, 1981. Moreover, Prudential accepted possession and control of the vessel in May, 1979; delivered it to another charterer in August, 1979; and had alterations made to the vessel in preparation for the new charterer while it was in Prudential's sole control. The dissent concludes that Prudential should not be allowed, at this late date, to obtain an order from the district court compelling arbitration.

We note the similarity of the concerns expressed by Judge Wyatt to policy considerations underlying the doctrines of laches and waiver. For example, the doctrine of laches instructs that an inequity might result in a case where a claim is permitted to go forward where relevant evidence has been lost due to a petitioner's delay in bringing suit. *LaGares v. Good Commander Shipping Co.,* 487 F.Supp. 1243 (S.D.N.Y.1980). A court of equity confronted with a laches issue must consider whether the plaintiff has inexcusably slept on his rights so as to make a decree against the defendant unfair. *Russell v. Todd,* 309 U.S. 280, 287, 60 S.Ct. 527, 531, 84 L.Ed. 754 (1940). One factor traditionally considered by courts of equity in determining whether a plaintiff's claim is barred by laches is the prejudice to the defendant resulting from the delay. *Public Adm'r of New York v. Angela Compania Naviera, S.A.,* 592 F.2d 58, 63–64 (2d Cir.1979), *cert. dismissed,* 443 U.S. 928, 100 S.Ct. 15, 61 L.Ed.2d 897 (1979). Judge Wyatt is understandably concerned with the issue of likely prejudice to Exxon resulting from Prudential's extended delay before making known its claim and seeking arbitration. Therefore, we believe it is fruitful to consider how courts have dealt with laches in conjunction with motions to compel arbitration.

The seminal case in this area is *Trafalgar Shipping Co. v. International Milling Co.,* 401 F.2d 568 (2d Cir.1968). *Trafalgar,* like the instant case, involved responsibility for repairs to a vessel which had been chartered by petitioner Trafalgar, the owner, to respondent International. Approximately four years after the charter had ended, Trafalgar demanded that the dispute be submitted to arbitration, and thereafter brought suit to compel arbitration in the district court pursuant to 9 U.S.C. § 4. International asserted that Trafalgar's right to arbitrate was barred by laches. This court held that "all questions of delay which relate to issues which the parties have agreed to submit to arbitration [are to] be resolved by the arbitrators, not the court." *Id.* at 571. The court's reason for so holding was that:

> in the often esoteric field of commercial dealings, and in admiralty, it would seem that the severity of prejudice suffered through delay, and the reasonableness of excuses offered by the dilatory party, the

elements of laches, might be resolved better where resort is had to the expertise of the arbitrators.

*Id.* at 572. The court noted that parties to a charter agreement could avoid this result by expressly providing in their agreement that all issues of laches be submitted to the court. *Trafalgar* also noted one instance when questions of delay could be properly decided by a court, which is when such questions:

> relate to and affect issues which [the court] is called upon to decide in connection with the motion under 9 U.S.C. § 4.
>
> . . . .
>
> The *only* issues which the court is authorized to consider on a motion to compel arbitration are ones which pertain to "the making of the arbitration agreement or the failure, neglect, or refusal to perform the same." . . . If one of *these* issues is disputed before the court, *and* if one party claims that its ability to present proof in relation thereto has been prejudiced through the delay of the other, the court *may consider whether it is fair to permit the dilatory party even to invoke its processes under the Act.*

*Id.* at 571. (citations omitted) (emphasis added). Thus, under *Trafalgar,* only if the alleged laches pertains to the making of the arbitration agreement or the failure, neglect, or refusal to comply therewith—the two issues which the court is required to decide under the Federal Arbitration Act— is the court free to dispose of the laches issue. In all other cases, laches must be decided by the arbitrator.

*Trafalgar* has been consistently followed in this circuit when questions arise as to whether arbitration should be compelled after long delay. Most recently, this court followed *Trafalgar* in *Conticommodity Serv., Inc. v. Phillipp & Lion,* 613 F.2d 1222 (2d Cir.1980). *Conticommodity* involved an arbitration clause contained in a customer's agreement between petitioner and respondent for trading in metal futures. The arbitration clause contained a one year time limit within which the arbitration machinery could be invoked. Four years after a disagreement arose, Philipp demanded arbitration and Conticommodity argued that the demand was untimely. The district court held that the issue of timeliness was properly before the court, and that the demand for arbitration was untimely. This court reversed. Judge Feinberg, writing for the court, noted the temptation to a district court to decide the merits of a laches defense:

> Determining the merits of such defenses may often appear to be a simple task that should not be delayed or deferred, and judges are, by training and temperament, prepared to decide the issues that come before them. Furthermore, there is inevitably some judicial hostility toward the view that a court is deprived of jurisdiction over procedural questions simply because the parties have agreed to arbitrate disputes.

*Id.* at 1224. The court concluded that the Federal Arbitration Act carefully limits the role of courts in considering motions to compel arbitration. *Id.*

■ This view on the laches issue in conjunction with the Federal Arbitration Act has also been widely adopted by courts in this and other circuits. *E.g., Halcon Int'l, Inc. v. Monsanto Australia Ltd.,* 446 F.2d 156 (7th Cir.), *cert. denied,* 404 U.S. 949, 92 S.Ct. 286, 30 L.Ed.2d 266 (1971) (arbitration compelled pursuant to construction contract after five years had elapsed between injury and motion to compel arbitration); *Singer Co. v. Tappan Co.,* 403 F.Supp. 322 (D.N.J. 1975), *aff'd,* 544 F.2d 513 (3rd Cir.1976) (arbitration compelled pursuant to goods contract after three years had elapsed between injury and filing of motion to compel arbitration); *In Re Arbitration Between Maritime Co. "Spetsai," S.A. and International Commodities Export Corp.,* 348 F.Supp. 258 (S.D.N.Y.1972) (arbitration compelled pursuant to charter party after more than four year delay between injury and filing of motion to compel).

Here, the parties did not specifically provide in their agreement that all issues of laches should be submitted to the court. Moreover, as we have noted above, no issue

was presented regarding the making of the agreement or the failure, neglect, or refusal to comply therewith. Thus, the potential laches issue [6] and implicitly the concern of prejudice to Exxon raised by the dissent herein constitute issues properly presented to the arbitrators.

A similar analysis would also apply to a waiver defense here. For instance, in *World Brilliance Corp. v. Bethlehem Steel Co.*, 342 F.2d 362 (2d Cir.1965), this court held that waiver, as well as laches, is an arbitrable issue. There, Judge Waterman, writing for this court, concluded that nothing in Section 4 of the Federal Arbitration Act "expressly bars enforcement of an agreement to arbitrate [where waiver is asserted as a defense] in a suit brought under Section 4. Nor should such a bar be inferred on any but the strongest grounds." *Id.* at 365.[7] We agree with Judge Waterman's assessment.[8] Accordingly, we affirm the district court's order compelling arbitration.

WYATT, District Judge, dissenting:

The majority decision affirms an order directing the charterer (Exxon) to arbitrate a "dispute" based on a claim first raised by the owner (Prudential) long after redelivery of the vessel had been completed and the charter had thereby been terminated. The claim, however now phrased, is (in the terms of the charter) that the condition of the vessel, when offered by Exxon for redelivery, was worse than it had been when delivered to Exxon, and that the damages were in excess of "ordinary wear and tear". It is contended by Prudential that arbitrators should determine whether repairs would have been necessary prior to redelivery in May 1979 to put the vessel in the same condition it was in at the time of its delivery to Exxon and, if so, Prudential alleges that Exxon is now responsible for the cost of such repairs.

The charter, for a sensible reason, provides that such a claim must be made, arbitrated, and decided *before* redelivery is effected. The reason is to achieve a basic objective of the redelivery provisions that, *before* redelivery, all repairs for which the charterer is responsible, if any, be determined by agreement of surveyors from both parties or by arbitration of any dispute. This objective recognizes the importance of establishing *at the time of redelivery* the then condition of the vessel rather than to delay this determination to some later date when the condition of the vessel will have been changed by operations of the owner, or of new charterers, or by the mere passage of time. It is the condition of the vessel at the time of redelivery which is relevant in determining whether the charterer is responsible for making repairs.

To reinforce the requirement that the condition of the vessel must be agreed upon or arbitrated before there is redelivery, it is also provided in the contract that an adequate opportunity be given to the owner to inspect the vessel when tendered for redelivery and that acceptance by the owner of the vessel thereafter is "conclusive evidence" that the charterer has complied with all of its obligations "with respect to the vessel's class and condition at the time of redelivery". Thus, by the terms of the charter, no claim can be made by Prudential after redelivery—either in arbitration, in litigation, or otherwise—based on the condition of the vessel when redelivered.

---

**6.** We note that Exxon did not raise a laches defense in its brief.

**7.** There, as here, the contract included an arbitration agreement broad enough to cover procedural issues such as waiver. The arbitration agreement in *World Brilliance* stated, in part, "any dispute or difference arising between the parties * * * as to any matter or thing arising out of or relating to" the contract shall be arbitrable. 342 F.2d at 363.

**8.** We note that Judge Wyatt's dissent cites a number of cases in which the waiver defense was decided by the court, not the arbitrator. See text *infra* at 69. Those cases are distinguishable from the instant case and *World Brilliance* in that each addressed the question whether a waiver of a party's right to demand arbitration of a dispute had occurred in situations where that party had previously participated in court proceedings to litigate the same dispute. In contrast, here, and in *World Brilliance*, no such court action was instituted.

Despite its knowledge that its claim could not survive acceptance of the vessel in redelivery, it was important to Prudential at that time to secure a *prompt* retransfer of possession and control from Exxon, because Prudential was then negotiating to turn over the vessel to another charterer. Consequently, Prudential did not wish to raise any dispute at the time of redelivery. The arbitration of such a dispute to a final decision would necessarily have meant a delay in Prudential obtaining possession and control of the vessel. Therefore, Prudential deliberately, with full knowledge of the consequences, and for its own advantage, accepted the vessel from Exxon in redelivery without raising any question about the ship's condition. It was thus able, on the very same day on which it took back the vessel from Exxon, to execute the new charter to Apex Towing Company.

Various alterations and additions to the vessel were required by the new charter before delivery of the vessel to Apex. These were separate and apart from any necessary "repairs" that, before redelivery, might have been claimed to be a responsibility of Exxon.

By the terms of the charter (clause 13(d)) Exxon had "the right" to make any repairs for which it had been found responsible in arbitration before redelivery, unless certain conditions were met by the owner to permit the owner to make such repairs at the expense of the charterer. Having already secured possession and control of the vessel from Exxon, Prudential disregarded the terms of the charter. Without any arbitration, without any compliance with the conditions for permitting the owner to make repairs, and without any communication with Exxon, Prudential, on its own decision, arranged to have alterations, additions, and repairs made to the vessel. Thereafter, on or about August 18, 1979, Prudential delivered the vessel to Apex. Later—on March 18, 1980—Prudential made a claim against Exxon for some two million dollars. Much later—on January 23, 1981—Prudential made a demand for arbitration of this claim and the majority decides that Exxon must now arbitrate.

As has been seen, the charter requires that any claim based on the condition of the vessel be arbitrated *before* redelivery is made. Prudential had raised no dispute at that time but had accepted the vessel as redelivered. Such acceptance is, according to the charter, "conclusive evidence" that Exxon has no obligation respecting the condition of the vessel when redelivered. The majority decision nevertheless requires Exxon to submit to arbitration the issue whether it has such an obligation. This is contrary to the terms of the charter and compels Exxon to arbitrate a dispute which it never agreed to arbitrate. I must therefore respectfully dissent.

1.

This dissent is not based on differences with the majority as to the policies and principles of arbitration law, ably set out in the opinion of Judge Pierce. Nor is this dissent based on equitable considerations arising from the conduct of Prudential, although the result reached by the majority is unjust and unfair to Exxon. The reasons for my disagreement with the majority are:

(a) Exxon never agreed to arbitrate a dispute over the condition of the vessel at redelivery initiated by the owner after redelivery had been completed;

(b) Prudential has no claim based on the condition of the vessel at redelivery because its acceptance of the vessel at that time is, according to the charter, "conclusive evidence" that Exxon has complied with all its relevant obligations; and

(c) By its acceptance of the vessel in redelivery, to further its own purposes and interests, Prudential waived any right it may have had to compel arbitration as to the vessel's condition when redelivered.

The determination of the issues embodied in these reasons is for the Court, not for arbitrators.

As to (a), the majority opinion correctly recognizes that "whether a dispute between

the parties is covered by the arbitration agreement is for the courts to decide" (P. 63).

As to (b), the same principle would apply since the arbitration agreement in the charter would not cover a claim conclusively barred by a provision of that charter.

As to (c), a distinction must be drawn between the doctrines of laches and of waiver. The words are frequently used as though the doctrines are the same but, in my understanding, they are very different. Laches occurs when a party delays in asking for arbitration to such an extent that relevant evidence has been lost and there is prejudice to the other party. *Reconstruction Fin. Corp. v. Harrisons & Crosfield,* 204 F.2d 366, 370 (2d Cir.1953). Waiver occurs when a party takes some affirmative action inconsistent with the assertion of a right to arbitrate and there is prejudice to the other party, *American Broadcasting Co. v. Ali,* 434 F.Supp. 1108, 1112 (S.D.N.Y.), *aff'd mem.,* 573 F.2d 1287 (1977), as for example by participating in a lawsuit or, as here, by an owner accepting redelivery of a vessel without asking beforehand for arbitration as to its then condition.

The majority refers to "laches or waiver" and concludes (correctly in my opinion) that whether laches (mere delay) bars arbitration is for decision by the arbitrators.

My disagreement on this point is because the conduct of Prudential raises the issue of waiver, not that of laches, and whether there has been waiver is for decision by the Court, not by the arbitrators. While this Court does not seem to have declared in so many words that waiver in arbitration cases is to be determined by the Court, waiver has in fact been so determined in the cases here decided. *Merrill Lynch, Pierce, Fenner & Smith v. Lecopulos,* 553 F.2d 842, 845 (1977); *Demsey & Assocs. v. S.S. Sea Star,* 461 F.2d 1009, 1018 (1972); *Carcich v. Rederi A/B Nordic,* 389 F.2d 692, 696 (1968); *Chatham Shipping Co. v. Fertex Steamship Corp.,* 352 F.2d 291, 293 (1965); *American Broadcasting Co. v. Ali,* 434 F.Supp. 1108, 1112 (S.D.N.Y.), *aff'd mem.,* 573 F.2d 1287 (1977); *see Clar Prod., Ltd. v. Isram Motion*

*Pictures,* 529 F.Supp. 381, 383 (S.D.N.Y. 1982); *Janmort Leasing, Inc. v. Econo Car Int'l, Inc.,* 475 F.Supp. 1282, 1288 (E.D.N.Y. 1979). In other circuits, it has been expressly stated that waiver is an issue to be determined by the Court. *Mercury Constr. Corp. v. Moses H. Cone Mem. Hosp.,* 656 F.2d 933, 939–40 (4th Cir.1981) *(en banc); Burton-Dixie Corp. v. Timothy McCarthy Constr. Co.,* 436 F.2d 405, 408 (5th Cir.1971); *N & D Fashions, Inc. v. DHJ Indus., Inc.,* 548 F.2d 722, 728–29 (8th Cir.1976); *Martin Marietta Alum., Inc. v. General Elec. Co.,* 586 F.2d 143, 146 (9th Cir.1978).

2.

The arbitrators, according to the majority, should decide "several sub-issues" which come down to whether there was an "acceptance" of the vessel by Prudential.

There can be no issue nor sub-issue of acceptance, however, because the present record fully establishes that there was an acceptance. This is true whether or not the surveyor selected by Prudential had authority to sign a certificate. If (contrary to my belief) he had no such authority, this would not alter the fact that possession and control of the vessel were received by Prudential from Exxon on May 25, 1979, and have been kept ever since. Prudential made a new charter of the vessel on May 25, 1979, an exercise of ownership which would not, and could not, have been carried out unless, by acceptance, Prudential had secured possession and control. Insurance in favor of Prudential was made effective on May 25, 1979, and a head office official of Prudential (not the surveyor) authorized the taking of "physical custody" of the ship on the same date (248a; "a" references are to pages of the Joint Appendix). The affidavit supporting the petition to compel arbitration itself refers to the "return of the vessel in 1979" (7a).

There is no special, peculiar, or esoteric meaning to be sought for the word "acceptance". It is not defined in the charter but has its normal and ordinary meaning. "Acceptance" is "the act of accepting" and "accept" is "to receive with consent (something given or offered)". Webster Third New

International Dictionary, 10, 11 (1961). In this context, the word "acceptance" simply means that the owner receives with consent the possession and control of the vessel when its return is offered in redelivery.

The underlying premise of the majority, as I understand the opinion, is that there can be a redelivery, transferring possession and control to the owner, without there being any acceptance by the owner. This is logically and contractually impossible, in my view. If possession and control of a vessel are offered, the owner can either accept or reject. Had there been no acceptance by Prudential, Exxon would now have the vessel, and admittedly it does not and since May 25, 1979, has not.

The execution of a new charter to Apex and the actual delivery of the ship to Apex are totally inconsistent with the contention by Prudential that there was no acceptance of the ship by it. Illustrative in this connection are landlord and tenant cases where the question not infrequently arises whether there has been acceptance by the landlord of a surrender of a lease by the tenant. Where the landlord makes a new lease of the premises, this is uniformly held to amount to the acceptance of a surrender of the old lease. An example is *Gray v. Kaufman Dairy & Ice Cream Co.,* 162 N.Y. 388, 56 N.E. 903 (1900) where the New York Court of Appeals declared (at 398, 56 N.E. at 906):

> It is manifest, therefore, that the act of plaintiff in reletting said premises under the circumstances referred to operated as an acceptance of the defendant's offer to surrender.

Another example is *Coe v. Haight,* 95 Misc. 603, 159 N.Y.S. 666 (App.Term 1916) where Judge Irving Lehman (later Chief Judge of the New York Court of Appeals) stated:

> The [tenant] ... showed that she gave the keys to the [landlord] and that the [landlord] thereafter rented the room. Concededly these acts on the part of the [landlord] constituted a surrender and acceptance, at least from the date of the re-renting. *Id.* at 608, 159 N.Y.S. at 669.

Everything in the record shows that after May 25, 1979, Prudential had possession and control of the ship. Prudential was able to dictate what alterations, additions, and repairs should be made because it had such possession and control. The very claim now sought to be asserted by Prudential in arbitration could only have arisen from the possession and control secured by Prudential from Exxon.

Under all the circumstances, it seems plain that if the redelivery was completed (as it was) and if possession and control were turned back (as they were), it follows inevitably that there was acceptance of the vessel by Prudential.

The majority opinion notes that the District Court made no findings of fact. If such omission means that this Court cannot find acceptance of the vessel from the present record, it would seem far better to remand to the District Court for a determination of this fact, easily shown, than to compel a long and expensive arbitration.

### 3.

A dispute over the condition of the vessel at the time of redelivery, which is not raised until *after* redelivery, is not covered by the agreement to arbitrate; so it appears to me. This is not a question of laches (delay, lapse of time) but of the sequence of events tested against the terms of the contract. The charter provides that the condition of the vessel when offered in redelivery must be determined by agreement or arbitration before or at that time, not afterwards. It is not a question of how long after, or of the excuses for delay, or of what prejudice the other party may have suffered; according to the contract, one minute after would have the same result as one year. The policies and precedents for the doctrine of laches are inapplicable here.

Exxon never agreed to submit this dispute to arbitration unless it was raised before redelivery was completed, and it was not so raised.

### 4.

In order to understand this appeal, and my differences with the majority (as al-

ready summarized), the facts must be reviewed and an evaluation of the governing contract must be made.

The vessel *Saroula,* owned at the time by Skouras Lines, Inc., was chartered to Exxon (or its predecessor) by a demise or bareboat charter dated as of November 22, 1961. The distinctive characteristic of bareboat charters is that "full possession and control of the vessel are delivered up to the charterer for a period of time". *Reed v. The Yaka,* 373 U.S. 410, 412, 83 S.Ct. 1349, 1351, 10 L.Ed.2d 448 (1963).

The vessel was delivered to Exxon on or about May 13, 1964 (35a, 47a). The period of the charter was fifteen years and the time for redelivery by Exxon would be on or about May 13, 1979.

The ownership of the *Saroula* changed from time to time as between the three companies in the "Skouras group of companies" (a term used by counsel for the group, 108a). The three companies were Skouras Lines, Inc. ("Skouras Lines"), World Wide Tankers, Inc. ("World Wide"), and Prudential Lines, Inc. ("Prudential") (105a–108a).

In 1975, ownership of the vessel was transferred from Skouras Lines to World Wide and an addendum to the charter (dated as of August 1, 1975) substituted World Wide for Skouras Lines in the charter (252a–253a). At some time between March 15 and May 25, 1979, title to the *Saroula* seems to have passed from World Wide to Prudential. This is learned from a pleading filed by Prudential in a civil action in the Civil Court of the City of New York described in an affidavit for Prudential submitted to the district court (95a–96a). The pleading stated that the *Saroula* was "purchased" by Prudential from World Wide subsequent to March 15, 1979; the date of purchase is not given but it must have been before May 25, 1979, because the pleading states that on May 25, 1979, Prudential executed a new charter of the vessel to Apex Towing Company.

Prudential had been negotiating the new charter to Apex since early 1979. The new charter required the addition, among other things, of heater coils to the ship. In March 1979, Skouras retained Robert Carter Morrell to develop plans for modifications and additions to the vessel for the new charter to Apex (123a), and Morrell was asked by Prudential's financial Vice-President, Ytuarte, to be "owner's representative on the redelivery" (124a).

5.

Morrell was not a casual or random selection by the Skouras companies to work on the *Saroula* in 1979. On the contrary, he had an intimate knowledge of the *Saroula* dating from the time of its construction, had twenty years of association with the Skouras companies, and had an extensive background in marine engineering and naval architecture, with forty-three years experience in this field.

6.

In April 1979, Exxon notified Prudential that the *Saroula* would arrive for redelivery at Norfolk Shipbuilding & Dry Dock Company (Norfolk Company) a little later than May 13.

Exxon then selected Worrel, one of its Repair Supervisors, to be its representative at the redelivery. In addition, Exxon decided that Alyn Fife, an outside consultant, would also be employed to attend the redelivery in the event that there was any dispute concerning the vessel's condition at redelivery.

Coast Guard certificates to the vessel's condition were sent to Prudential in early May 1979 (64a). On May 18 Captain John Haw of Prudential telephoned Exxon to say that Haw was responsible for Prudential for the redelivery, and that Carter Morrell and Sheridan Lee would represent the owner at the redelivery. Haw asked for a sea trial of the *Saroula* "prior to the redelivery survey" and Exxon agreed to this although it was not a precondition of redelivery under the charter (60a).

Morrell understood from Prudential that he was to deal with Haw for Prudential (156a–159a, 162a).

7.

In advance of the arrival of the *Saroula* at Norfolk for redelivery, it had been deter-

mined by Prudential that, before delivery of the vessel by Prudential under the new charter to Apex, the annual survey by the ABS and the Coast Guard would be advanced in time. This annual survey was not due until October, 1979 but, by advancing it to the period just after redelivery by Exxon, the necessary work could be done concurrently with the heater coil installation, clean ballasting, and other changes required by the charter from Prudential to Apex. This would avoid taking the *Saroula* off-hire while it was under the charter to Apex and was believed to be a great advantage to Prudential. Morrell recommended this plan, Ytuarte agreed for Skouras companies, and by May 3, specifications needed for the annual survey had been developed by Morrell (131a, 132a, 194a, 195a).

8.

On the morning of May 21, 1979, Morrell (assisted by Lee) as the owner's representative for redelivery met in Norfolk with Worrel (assisted by Fife) as the charterer's representative and boarded the *Saroula* (138a).

There was then a sea trial of the ship. Morrell checked the operation of all machinery—including main engine, boilers, and auxiliaries. Where there was duplicate equipment, the engineers changed over so that Morrell "could witness everything in operation" (138a). Morrell talked to the master and the chief engineer and, at his request, they demonstrated all machinery. Morrell asked about general problems and about specific problems. The result of the sea trial was that "nothing untoward developed" (139a). The ship docked at Norfolk in the afternoon of May 21.

Continuing in the afternoon of May 21 and until the afternoon of May 25, the vessel was surveyed in accordance with Clause 16(b) of the charter. On Thursday, May 24, the vessel was put in dry dock. The survey was thus "on dry dock and afloat", as provided in the charter (20a).

9.

Captain Haw came to Norfolk on May 24 and was on the ship to acquaint himself with its condition (222a). He discussed matters with Morrell and Lee and returned to New York the evening of May 24 (247a, 248a).

10.

The charter provided for separate treatment on redelivery for "inventory". Morrell and Worrel agreed that storekeepers from Norfolk Company would take the inventory during the period of May 21 through May 25. At its completion, the leading storekeeper reported that "substantially more equipment, gear and stores were on board the vessel than at the time of delivery" (67a).

11.

As already noted, the vessel was put in dry dock on May 24. On that day and the following, ABS and Coast Guard inspectors examined the ship, not as part of the annual survey but to verify compliance with maintenance of ABS class and with Coast Guard requirements (Clause 13(a), 67a). No deficiencies were found and prior ABS deficiencies were cleared up (67a). The Coast Guard had "nothing against the ship" (147a) except for one (apparently minor) deficiency which involved a defective section of cargo piping (148a).

12.

The surveys by owner and charterer were made on May 21, 22, 23, 24 and 25. On May 25 they were completed and Morrell and Lee for the owner, and Worrel and Fife for the charterer, met in the vessel's lounge. Morrell gave his fifteen page, handwritten, "condition survey" (72a–86a) to Worrel. A close study of this survey shows that the condition of the ship, with relatively minor exceptions, was found to be good. Morrell's reports to Prudential throughout the period through May 25 are consistent with this survey given to Exxon in that, according to Prudential's admissions in its state court pleading, Morrell reported "that the vessel was in a good state of repair and operating condition".

As a result of the discussion between the surveyors of the parties, it was believed that the cost of the repairs for which Exxon might arguably be responsible (estimated

by Morrell at about $150,000 (179a)) was roughly the same as the value of inventory then on the ship in excess of that when delivery took place to Exxon in 1964 (the excess inventory was understood by Morrell to have "a value of about $150,000" (153a)). Worrel had also pointed out in the discussion that Exxon had made a number of improvements to the vessel which enhanced its efficiency and value—a "bulbous bow, [an] oil lubricated stern bearing, and automation of the fireroom" were mentioned (154a–155a).

As a result of their beliefs and the discussion, it was proposed that Exxon turn over to Prudential without charge all inventory (except fuel) then on the vessel, including equipment, replacement parts, spares, unbroached consumable stores, etc., and leave without charge the improvements made during the term of the charter, and in return that Prudential should accept redelivery of the vessel "as is" (69a), thus assuming responsibility for the repairs for which in their discussion Exxon arguably might be responsible (149a).

With respect to an acceptance of the ship "as is", there was a significant factor which had been influencing Prudential for some time. This was the advantage to Prudential of securing possession and control of the vessel as soon as possible, without waiting for agreement or arbitration as to repairs to be made by Exxon and without waiting for Exxon to make the repairs, as it had a right to do under the charter. Prudential was anxious to make a new charter of the *Saroula* to Apex, and the earlier the redelivery by Exxon, the earlier the new charter could be executed, the additions and modifications necessary for Apex could be made, delivery to Apex effected, and receipt of the new charter-hire commenced. Additionally, a second advantage to Prudential from an early redelivery by Exxon was the opportunity to conduct the periodic, annual survey by the ABS and the Coast Guard due in October at an earlier date.

The advantages to Prudential from Exxon's proposal were therefore apparent to Morrell. He was "concerned on the time

angle of meeting the date of the Apex charter" among other things because he "would have been unable to put the heater-coil work in hand until [Prudential] had possession of the ship" (170a). This was because he "didn't think Exxon would permit [Prudential] to do work, our work, on their ship. It would still be their ship" (171a).

In response to the Exxon proposal, Morrell said that the proposal was worth looking into, and that he "would have to take it up with Prudential" (156a). The meeting was then adjourned for about an hour. Morrell went to a telephone in the officers' lounge of the ship and called Captain Haw at Prudential in New York (156a, 222a). Morrell and Haw differ as to what was said in this conversation.

When the meeting resumed Morrell stated that he agreed on behalf of Skouras Lines to accept redelivery of the vessel from Exxon (according to Morrell, Haw had told him "to take delivery on behalf of Skouras Lines" (169a)). A Certificate of Acceptance and Redelivery was then signed (69a, 87a, 168a). This certificate recites that at 1700 on May 25 Exxon "redelivered" the vessel to World Wide Tankers and that World Wide Tankers "accepted" the vessel. In accordance with what he testified were the directions of Haw, Morrell struck out the signature of World Wide Tankers and substituted the name "Skouras Lines, Inc." (169a). Morrell signed for Skouras Lines and Worrel signed for Exxon. Morrell then mailed a copy of the Redelivery and Acceptance Certificate to Haw, "probably" on May 25 (170a).

13.

In reliance on the agreement made in good faith with Prudential, possession and control of the *Saroula* were turned over by Exxon to Prudential on May 25, 1979. Insurance on the vessel for Prudential had been arranged through Haw by the New York office of Prudential in advance, to come into force when Prudential received the vessel on May 25, 1979. Since that date, control of the vessel has been exercised by Prudential, not by Exxon.

14.

On the day when the *Saroula* was redelivered by Exxon—May 25, 1979—Prudential executed a charter of the vessel to Apex Towing Company. This does not appear in the record made below but is found in a pleading filed by Prudential in the state court litigation to which reference has already been made. The Apex charter promised delivery by Prudential of the vessel to Apex between July 1 and July 31, 1979. According to the Prudential pleading (para. 12), the *Saroula* was in fact delivered to Apex "on or about August 18, 1979".

15.

Having secured possession and control of the vessel on May 25, Prudential gave a number of orders to Norfolk Company: (a) to add heater coils and clean ballast equipment and to complete other items required by the Apex charter; (b) to advance and commence the annual survey by the ABS and the Coast Guard, otherwise due in October; and (c) to make such repairs as Prudential had itself determined to make (132a, 188a, 199a, 206a–209a). So far as appears from the record, Exxon was told nothing, and knew nothing, about what was being done to the vessel.

16.

On June 12 and 14, 1979, Skouras spoke by telephone to W.F. Robinson of Exxon. Skouras, according to his file memoranda, told Robinson that "repairs" on the ship were anticipated to run about $1,100,000, that he did not know "whether the repair costs would be for the account of Exxon or the account of World Wide", and that after reviewing the quotations from Norfolk Company, he would be "in a position . . . to know whether we believe we have any further claims against Exxon" (238a, 245a).

Skouras raised no dispute with Exxon in these conversations held shortly after the redelivery; he made no suggestion that the redelivery be rescinded and that Exxon resume the possession and control of the *Saroula*. On the contrary, Skouras retained for Prudential the benefits of redelivery, primarily, possession and control of the vessel.

17.

Under date of March 18, 1980—some ten months after Exxon had turned over possession and control of the *Saroula* to one or the other of the Skouras companies—Skouras wrote to Exxon, making a claim on behalf of World Wide Tankers against Exxon for some two million dollars. Part of this was for "repair costs at the Norfolk yard and elsewhere" for "items which were Exxon's responsibility under the Exxon charter" (53a). Part of this was for "loss of hire" by interruption of "the vessel's new charter employment" in order to make the repairs (53a).

The Skouras letter of March 18, 1980, is in substance an acknowledgment that redelivery of the vessel had taken place on May 25, 1979, but sets forth what to me seems a totally erroneous statement of a charter provision (54a):

Under clause 13(d) of the charter World Wide was clearly entitled to accept redelivery of the vessel for husbanding purposes, arrange for repairs, renewals and replacements, and call upon Exxon to pay for the costs of performing all such work.

Clause 13(d) does not by any stretch justify such a statement; on the contrary, it provides that responsibility for repairs must be determined *before* they are made, that the charterer then has a *right* itself to make the repairs, and that the owner can avoid such right only by satisfying two conditions, neither of which Prudential satisfied or even attempted to satisfy.

Under date of April 25, 1980, Exxon replied to the Skouras letter, rejecting any claim and pointing out that its redelivery obligations had been satisfied.

18.

Under date of January 23, 1981—something over ten months after the claim asserted by World Wide Tankers—a demand for arbitration was addressed to Exxon by an attorney for Prudential (28a). How Prudential came into the matter was not shown in the demand except for the statement that Prudential is "successor in interest to World Wide Tankers, Inc., successor in interest to The Skouras Lines, Inc." (28a).

Under the date of February 19, 1981, Prudential appointed an arbitrator.

### 19.

On May 18, 1981, a petition to compel arbitration was filed in the district court. The affidavit in support of the petition recites that there was a "return of the vessel in 1979" and that it was Prudential who performed the repairs after the vessel had been returned (7a). There was no explanation as to why World Wide Tankers had asserted a claim for the repairs on March 18, 1980.

Opposing affidavits were submitted by Exxon.

On June 22, 1981, Judge Haight filed an order with memorandum opinion denying the petition (90a–91a); judgment on this order was entered on June 29, 1981. Prudential's claim was described as alleging that Exxon "redelivered the chartered vessel in damaged condition" and is liable "for the cost of post-redelivery repairs to such damages". It was noted (correctly in my view) that Exxon's responsibility for repairs, by "explicit and unambiguous" provisions of the charter was to be "both measured and satisfied before redelivery of the vessel; and that acceptance of the vessel [by the owner] at the time of redelivery put an end to the issue". As to the authority of Morrell to accept the vessel, Judge Haight found nothing in the record "to negate the apparent authority with which [Prudential] clothed" Morrell (91a).

### 20.

On June 29, 1981, Prudential filed a motion that the district court "reconsider" its order denying the petition and "order a trial to resolve disputed issues of fact" (93a–94a).

On September 9, 1981, Judge Haight filed an order with memorandum opinion granting reargument to the extent of the issue whether the authority of Morrell to accept the vessel was required to be arbitrated by the terms of the charter. Oral argument was heard on this issue and further memoranda were received.

On April 1, 1982, an opinion and order were filed by Judge Haight (279a–291a). Contrary to his first order, Judge Haight now, by a second order, vacated the earlier denial of the petition to compel arbitration and granted that petition. The opinion explained that the controlling issue was whether Morrell had authority to accept the vessel and that such issue was required to be submitted to arbitration (280a).

This appeal by Exxon from the order then followed.

### 21.

The basic objective of the redelivery provisions of the charter is that, *before* the redelivery, all repairs for which the charterer is responsible, if any, be determined by agreement of surveyors from both parties or by arbitration of any dispute. The reason for this is doubtless "[t]he frequency with which disputes occur between the owner and charterer regarding the condition of a demised vessel . . . ." Gebb, *The Demise Charter: A Conceptual and Practical Analysis,* 49 Tul.L.Rev. 764, 778–79 (1975).

Clause 16 of the charter deals with redelivery.

The vessel is required to be redelivered in as good order as when delivered unless the "lack of good order . . . is due solely to ordinary wear and tear" (19a, 20a).

The vessel "shall be surveyed on dry dock and afloat by representatives of the Charterer and the Owner" who in writing "shall jointly agree upon and designate the repairs or work necessary to place the vessel on the date of redelivery in the condition required . . . " (20a).

Where the representatives do agree upon and designate the necessary repairs for which the charterer is responsible, the charter is explicit that the charterer must make such repairs *"before redelivery"* (Clause 16(c), 20a, emphasis supplied). While the charterer makes the repairs, the vessel continues in the possession and control of the charterer who, of course, continues liable for charter hire until there is redelivery (20a).

If the owner wishes to obtain possession and control of the vessel without waiting for the charterer to make the agreed and designated repairs, the owner may, *with the consent of the vessel mortgagee* (20a, emphasis supplied) call upon the charterer to discharge its obligation for repairs "by payment to the Owner of an amount sufficient . . . to provide for the . . . repairs" (20a).

Having made or paid for the repairs designated by the representatives, the charterer may then redeliver the vessel, stopping charter hire and terminating the charter.

Thus, after the survey, when there is agreement between the representatives of the owner and charterer on the repairs for which the charterer is responsible, such repairs must be made by, or paid for by, the charterer *before* there is redelivery.

### 22.

Where, after a survey, the representatives of the owner and charterer are not able to agree as to the responsibility for repairs, and a dispute arises about this between owner and charterer, then under Clause 13(d) of the charter, arbitration is then and there required (18a).

If the result of the arbitration is a decision that the charterer is responsible for any of the repairs in dispute, then "the Charterer *shall have the right* at its expense to do the work . . ." (18a, emphasis supplied), the vessel meanwhile continuing in the possession and control of the charterer. Charter hire must be paid by the charterer for any period until redelivery during which the vessel remains in its possession and control to permit the completion of the necessary repairs (18a).

If the owner wishes to obtain possession and control of the vessel without waiting for the charterer to make the repairs for which by decision of the arbitrators the charterer is liable, he may do so if two conditions are met:

(a) that "the performance of such work by the Charterer shall unreasonably interfere with the Owner's or any Charterer's operation of the vessel" (18a); and

(b) that the vessel mortgagee consents (18a).

Assuming that these two conditions are met, "the Charterer shall, at the Owner's option, . . . pay to the Owner the cost of performing such work" (18a).

Having made or paid for the repairs for which the arbitrators decided that the charterer was liable, the charterer may then redeliver the vessel, stopping charter hire and terminating the charter.

Thus, after the survey, when there is a dispute between owner and charterer with respect to repairs, that dispute must be decided at that time by arbitration. If the arbitrators decide that the charterer is responsible for any repairs, the charterer has the right itself to make the repairs, or, if two conditions (described above) are met by the owner, the charterer must "pay to the owner the cost" of making the repairs. In either event, as I read the charter, the repairs must be made by, or paid for by, the charterer *before* there is redelivery. Clause 13(d) clearly means to me that while the charterer makes the repairs ordered by arbitrators and which the charterer has an explicit *right* to make, the vessel continues in the possession and control of the charterer. As a practical matter, repairs could not be made by the charterer to a vessel which was in the possession and control of another. It will also have been noted that the charterer must pay charter hire to the owner for the time required by the charterer to complete the repairs.

### 23.

Clause 16(d) of the charter reads as follows:

Acceptance of the vessel by Owner shall be conclusive evidence of Charterer's compliance with any and all of the Charterer's obligations under this charter with respect to the vessel's class and condition at the time of redelivery.

Here is a warning to the owner, in the charter clause on redelivery, that if it has any claim after the survey as to the condition of the vessel at the time of redelivery and as to the obligation of the charterer to make repairs, such claims must be made and determined *before* redelivery is effect-

ed. Acceptance of the vessel by the owner on redelivery will establish conclusively that the obligations of the charterer have been satisfied. As Judge Haight so well put it in his first decision in this case (91a):

> The parties, by explicit and unambiguous contractual language, provided that [charterer's] responsibility for repairs would be both measured and satisfied before redelivery of the vessel; and that acceptance of the vessel by [the owner] at the time of redelivery put an end to the issue.

### 24.

There was "acceptance of the vessel" by its owner Prudential as a redelivery at the end of the period of the charter. This, by the provision in Clause 16(d) is "conclusive evidence" that Exxon has complied with all its obligations "with respect to the vessel's class and condition at the time of redelivery". No issue as to the vessel's condition survives for arbitration after acceptance of the vessel on its redelivery. This was Judge Haight's first decision and was, in my view, entirely correct; it was error to change that decision.

The district court was led into error by accepting as the decisive issue "whether the authority *vel non,* actual or apparent, of [Prudential's] surveyor to execute the certificate of redelivery was an arbitrable dispute" (279a–280a). This is not the decisive issue; indeed, it is not even an important issue. The charter does not mention a "certificate of redelivery" or a "certificate of acceptance". There is no magic in such a document. The issue is simply whether there was, in the language of the charter, an "acceptance of the vessel by Owner." There can be such a certificate but I would suppose that acceptance of a vessel on redelivery is usually without any certificate of any kind. The question is simply whether the owner has received back the possession and control of the vessel. If he has done so, as Prudential indisputably did, then there has been an "acceptance of the vessel" within the meaning of the charter here.

### 25.

Despite the denials and disavowals of Prudential, there was authority in Morrell to accept the return of the vessel and to execute the certificate. Morrell interrupted his dealings with Exxon to submit the proposal to the head office of Prudential in New York and to the person (Captain Haw) to whom he had been instructed by Prudential to report and who had himself been on the ship in Norfolk the day before. If Haw needed authority from some one higher up, it was his duty, not that of Exxon, to obtain such authority. Skouras and the other higher-ups knew that the ship was at Norfolk for redelivery and that Morrell was representing Prudential at that transaction. It was the duty of the officers of Prudential to keep informed of the redelivery events. That these officers on the day of redelivery executed for Prudential a new charter of the vessel to Apex would strongly evidence that they had done so. If actual authority in Morrell was nevertheless lacking, there was an abundant appearance of authority. When Morrell told Exxon that he would put the proposal up to Prudential, when in fact he did telephone to the head office of Prudential, and when he told Exxon that he was authorized to accept the proposal and the redelivery of the ship, Exxon was amply justified in relying on the apparent authority which Prudential had itself created.

If Morrell did not have authority to sign the certificate or to accept redelivery of the vessel, it is clear from what is undisputed that Skouras and all the officers of Prudential, with full knowledge, themselves accepted the vessel; they moreover ratified all that Morrell had done and they accepted for Prudential the benefits from the Exxon proposal.

There has never been any effort or move of any kind by Prudential to rescind the transaction by which it reacquired the vessel from Exxon. There has been no offer to restore the vessel to the possession and control of Exxon, from which it was transferred in reliance on the agreement made by Morrell. The benefits from that agreement have been secured and retained by Pruden-

tial—principally the possession of the vessel, from which (among others) these benefits flowed: (a) ability to make a new charter to Apex and to deliver the vessel to Apex; (b) to make the additions and modifications required by the Apex charter at an earlier date and thus to advance the delivery date to Apex; and (c) to advance the periodic ABS and Coast Guard survey from October to May or June and thus avoid taking the ship off-hire when it would be under charter to Apex. Moreover, the excess inventory on the vessel has been retained by Prudential, and, of course, the improvements made by Exxon have been retained.

It is a basic principle of agency law that an unauthorized act of an agent if ratified by the principal is affirmed and "given effect as if originally authorized by him". Restatement (Second) of Agency § 82 (1957). An act is ratified if consent to such an act is manifested. *Id.* § 83, comment (b). This is further explained in the Restatement:

Thus, there is ratification if the purported principal with knowledge of the facts receives or retains property to which he is entitled only if the earlier transaction is validated .... Such conduct is evidence of his consent but even if he disclaims an intent to affirm, ratification results. This rule is based upon the belief that one should not be permitted to obtain or retain the benefits of an act purported to be done on his account unless he is made responsible for the means by which they have been obtained. *Id.* § 83, comment (c).

The law here is based on the ancient maxim that actions speak louder than words. No matter how much the transaction and the agent be disaffirmed or disavowed, if the principal retains the benefits of the transaction, this is ratification of the transaction and of the agent's authority. Prudential has never offered to restore the vessel to Exxon; by chartering to another, it put it out of its power to do so. As said in the Restatement just quoted: "Such conduct is evidence of his consent, but even if he disclaims an intent to affirm, ratification results."

A case in the Supreme Court, with some resemblances to that at bar, is a good illustration of the equitable elements in ratification. *Chicago, M. & St. P. Ry. Co. v. United States,* 244 U.S. 351, 37 S.Ct. 625, 61 L.Ed. 1184 (1917). The government sued to enjoin the operation of a railroad in a national forest in Idaho. An agent of the railroad company, Peck, had secured permission from the government for the company to construct and operate a railroad in the forest. This was done by Peck making a memorandum agreement that the company would execute and abide by stipulations to be prescribed by the government. This memorandum was made subject to ratification by the company. As described by the Supreme Court (244 U.S. at 354–55, 37 S.Ct. at 626–27):

There was no express ratification of the Peck memorandum, but shortly after it was made the company entered upon the reserve and actively proceeded with the construction of its road, which it would not have been permitted to do without the memorandum.

The company then declined to ratify the Peck memorandum or to execute the promised stipulations. The Supreme Court declared, however, that the company was bound by the Peck memorandum and must comply with it or discontinue its operations in the forest. The Supreme Court explained its reasoning as follows (244 U.S. at 358, 37 S.Ct. at 628):

Here the Secretary made it manifest, through the regulations before noticed and otherwise, that in his judgment due regard for the public interests required that a stipulation, such as was described in the Peck memorandum, be exacted of the company as a condition to the approval of the survey and map, that is, to securing the right of way. Rightly understanding that this was so, Mr. Peck, the company's representative, promised on its behalf that it would comply with that condition. The promise was given for the purpose of securing permission to

proceed at once with the construction of the road, and on the faith of the promise the permission was given. While this was said to be subject to the company's ratification, it must be held upon this record that there was an implied ratification. The company promptly availed itself of the permission and proceeded with the work of construction. The circumstances were such that it must have known how the permission was obtained. It was largely benefited thereby and to these benefits it ever since has held fast. True, after some months had elapsed, it manifested a purpose to disaffirm Mr. Peck's promise, but that was after the implied ratification and after the construction had proceeded so far that restoration of the original situation was not possible.

The effect of retaining benefits from a claimed unauthorized act of an agent is thus expressed by a standard treatise (1 F. Mechem, A Treatise on the Law of Agency § 434 (2d ed. 1914)):

> There is, further, ordinarily no more certain and satisfactory a method of manifesting approval of an act than voluntarily and knowingly taking the benefits which flow from its performance; and it is a general rule, of constant application in the law of agency, that he who, voluntarily and with knowledge of the facts, accepts the benefit of an act purporting to have been done on his account, by his agent, thereby ratifies it and makes it his own as though he had authorized it in the beginning.

A decision some years ago by a distinguished panel of this Court (L. Hand, Swan, and A.N. Hand) seems also applicable to the case at bar. *Gotham National Bank v. Sharood Co.,* 23 F.2d 567 (1928). The Bank was sued on a contract which in its defense it asserted to have been made by an officer, Hauser, not authorized to do so. The Bank had been paid moneys under the contract and had never returned such moneys. This was found to be a ratification of the agent's act in making the contract. Judge Swan, writing for a unanimous court, said among other things (23 F.2d at 572–73):

The authority of Hauser as the bank's agent is disputed. He was an assistant vice president and had complete charge of releasing the goods held in pledge. It is not necessary, however, to determine whether the making of the contract in question was within the scope of Hauser's authority, since the subsequent conduct of the bank constituted a ratification of his acts. Where the principal with knowledge of the facts retains the benefit of an unauthorized contract, he must be deemed also to have assumed its burdens.

\*    \*    \*    \*    \*    \*

But in any event it was notified of the contract by the bill of particulars and thereafter failed to return the moneys paid to it by plaintiff by reason of the contract. It must therefore be deemed to have ratified it.

The principle of this decision means to me that, if Morrell had no authority, retention by Prudential of the possession of the *Saroula* and of the other benefits received on redelivery of the vessel was a ratification by Prudential of the execution by Morrell of the Certificate of Acceptance and Redelivery and was an "acceptance of the vessel" by Prudential.

### 26.

The decision being made here is not only in disregard of the terms of the contract of charter. It seems to me that at the same time it is unfair and unjust to Exxon.

The agreement for redelivery was made by the representative Prudential selected and sent to Norfolk. No dispute of any kind was raised by any one from Prudential at that time. In reliance on this state of affairs, Exxon, on May 25, 1979, returned to Prudential the possession and control of the ship. Had a dispute been raised by Prudential at that time as to repairs for which Exxon was believed responsible, Exxon had a right under the charter to retain possession of the ship until this dispute was arbitrated. To determine the condition of the vessel at the time, the arbitrators would have had available the testimony of wit-

nesses who could examine the vessel at or shortly after the redelivery. If the arbitrators had found Exxon responsible for any repairs, Exxon would have had the right itself to make those repairs while the vessel was in its possession. Prudential could have taken over possession of the vessel and made the repairs *only* by meeting two conditions already described and by exercising an option to ask Exxon to pay the cost of any repairs for which the arbitrators had found Exxon responsible. Prudential did not meet nor even attempt to meet those conditions nor did it exercise its option.

Instead, Prudential accepted the redelivery of the vessel and the excess inventory, equipment, spares, etc., which formed part of the agreement made by Morrell. Prudential has since retained and enjoyed all the benefits of possession of the vessel, including hire from a new charter or charters, and the other benefits conferred by the agreement for redelivery. Now, long after Exxon made redelivery and when it is impossible to restore the original situation, Prudential is being permitted to prosecute a claim in arbitration just as though there had never been a redelivery.

Now, contrary to the redelivery objective of the charter provisions, this Court is approving an order which will require, or may require, an attempt by arbitrators, long after the date, to determine the condition of the *Saroula* on May 25, 1979. The owner has used the vessel since then, Norfolk Shipyard has made additions and modifications since then, repairs have been made at the sole decision of Prudential since then, and Apex and undoubtedly other new charterers have used the vessel since then. The prejudice to Exxon is clear; even assuming those who took part in the events of 1979 are available, their memories are fading; the only written survey made at the time of the redelivery, that by Morrell (which is in the record at 72a–86a, the "condition survey"), is presumably disavowed by Prudential and not available as an admission of the vessel's then condition; and no new, neutral persons—including arbitrators—can reconstruct the condition of the *Saroula* in May 1979 from her appearance now. Exxon has

lost its right, explicitly conferred in the charter, itself to make any repairs decided by the arbitrators to be its responsibility; Prudential has solely decided what repairs should be made and has made them, along with modifications and alterations intermingled. Prudential has received all the excess inventory and the like given up by Exxon as part of the consideration for the agreement of redelivery. Present inventory of the vessel (and the other items) is meaningless to permit any adjusting reimbursement of Exxon.

What appears to me to be an inequitable result is due to a failure to enforce reasonably clear provisions of the contract made by the parties. Exxon is being required to submit to arbitration a dispute which it has not agreed to submit to arbitration; the claim being sent to arbitration was wiped out when the return of the vessel was accepted; and by the same acceptance arbitration was waived.

I would reverse the order from which this appeal is taken and would remand with instructions to reinstate the judgment entered June 29, 1981, denying the petition to compel arbitration.