**WAUSAU INSURANCE COMPANY, Plaintiff,**

v.

**ARGONAUT INSURANCE COMPANY, Defendant.**

**No. 84 Civ. 3995 (JFK).**

United States District Court, S.D. New York.

Feb. 19, 1988.

---

**24.** Affidavit of J.T. Thorpe at ¶ 2 (Jan. 6, 1987).

Raymond A. Corleto, Schiavetti, Begos & Nicholson, New York City, for plaintiff.

Barry Saretsky, Bower & Gardner, New York City, for defendant.

## OPINION AND ORDER

KEENAN, District Judge:

### Background

This case, in federal court under diversity jurisdiction, involves two insurance companies fighting over which shall pay damages to a woman who lost her left leg due to the medical malpractice of their insureds—a hospital and a doctor. In one of life's cruel ironies, the saga of Marion Jones' medical treatment comes to an end much the same way it began almost fifteen years ago—with someone concerned about money.

The plaintiff, Wausau Insurance Company, ("Wausau"), and the defendant, Argonaut Insurance Company, ("Argonaut"), have agreed to have the Court decide this action based on stipulated facts, and submitted exhibits. The Court will first set forth the stipulated facts and the contentions of the complaint; the Court will then explain its conclusion that Wausau is not entitled to any recovery.

### Facts

Wausau had issued an insurance policy to Dr. Rudolph Pelzer ("Pelzer") that was in effect from February 26, 1973 to February 26, 1974. The policy contained a $500,-000 cap on liability, and a further limitation in the event Pelzer was covered by any other insurance policy. This limitation stated,

> [i]f the insured has other insurance against loss or expense covered by this policy, the company shall not be liable under this policy for a greater proportion of such loss or expense than the applicable limit of liability stated in the declarations bears to the total applicable limit of all valid and collectible insurance against such loss or expense.

*See* Stipulated Facts, ¶ 4.

Argonaut became involved in this case based on the policy it issued to the Federation of Jewish Philanthropies of New York ("the Federation"), and the Federation's affiliation with the Hospital for Joint Diseases and Medical Center ("the Hospital"). Pelzer served as Chief of Plastic Surgery during the time the sad events underlying the entire dispute occurred. The Argonaut policy in question covered professional liability and named as insured the Federation and all of its affiliates. The policy covered the Hospital and contained a $1 million limit on liability. Argonaut's policy was subject to the satisfaction of a deductible by the insured in the amount of $50,000 per occurrence, including legal fees. Argonaut

has currently paid $950,536.00 arising out of the underlying malpractice case that is described below. The Argonaut policy defines insured as,

> ... the named insured and also includes:
>
> a.... administrative head of technical and professional departments ... volunteers ... all, while acting within the scope of their duties or as authorized by the named insured ...
>
> The designation "volunteer", includes, but is not limited to, professionals providing services for which compensation is considered incidental; and insurance hereunder, as respects such volunteer, is to be considered the only valid insurance in force.

See Stipulated Facts, ¶ 11. The policy also contained a provision concerning the application of other insurance policies.

> This insurance [the Argonaut policy] is excess over any other valid and collectible insurance, except that this insurance shall be considered as the only valid insurance in force as respects part-time employed and volunteer physicians while acting within the scope of their duties or as authorized by the named insured.

The dispute between Wausau and Argonaut arises out of the treatment, or lack thereof, given to Marion Jones when she was admitted to the Hospital as a service patient* on October 10, 1973 with an injury to her left leg. Her stay in the Hospital resulted in a lawsuit filed in New York State Supreme Court in New York County during October, 1975 against Pelzer and the Hospital ("the Jones lawsuit"). The suit alleged that Pelzer examined Jones on November 23, 1973, and sought to have her discharged from the Hospital "so that he could readmit her after she obtained a Medicaid card so that he could bill for his services." See Stipulated Facts, ¶ 15. Pelzer later sent a bill to Medicaid for the services he rendered on November 23, 1973 to Jones; Pelzer received $8.00. A further examination of the exhibits reveals additional facts. After Jones refused to discharge herself from the Hospital as requested by Pelzer, she was virtually ignored for five days. During the period, Jones' leg wound worsened and she requested to be seen by a doctor. Although she was seen by nurses, and given medication for pain, no physician attended to her, and she received no physical therapy. Her condition became so severe that by January, 1974, the Hospital had to perform a mid-thigh amputation of her left leg. See Argonaut Ex: M3, M9. As a result of the amputation, Jones was diagnosed as suffering from "severe reactive depression with anxiety features." See Argonaut Ex: M3.

After the Jones lawsuit was filed, Wausau assigned counsel for the defense of Pelzer, and Argonaut assigned counsel for the defense of the Hospital. After years of discovery, the case proceeded to trial on May 6, 1982. On May 24, 1982, Wausau sent Argonaut a telegram inviting it to "join in the defense" of Pelzer; Argonaut declined. On June 7, 1982, the trial court granted the Hospital's motion to dismiss the claim against it that sought punitive damages. The jury rendered a $3,000,000 verdict for plaintiff on June 11, with 70% of the liability apportioned to the Hospital and 30% apportioned to Pelzer. Special questions had been submitted to the jury, in response to which they found the following:

—Pelzer had abandoned Jones from November 27, 1973 through December 5, 1973, and from December 5, 1973 through January 23, 1974;

—Pelzer sought to discharge Jones from the Hospital when such a discharge was not medically indicated;

—Pelzer was acting within the scope of his authority as Chief of Plastic Surgery;

—Pelzer's attempt to discharge Jones was for the sole purpose of obtaining compensation for treatment and services rendered to a service patient, against Hospital policy;

—Pelzer's conduct was so wanton and reckless as to warrant the imposition of punitive damages for $250,000.

---

* A service patient is an individual admitted into a hospital as a patient of the hospital, and not of any particular physician. Such patients are often admitted after receiving care in an emergency room. A service patient is to be distinguished from a private patient, who is admitted to a hospital as the patient of a particular doctor.

After motions were made, the trial court reduced the verdict to $1.75 million and upheld the award of punitive damages. The Appellate Division, First Department, later reduced the award to $1.25 million, dismissed the punitive damages award, and left intact the jury's apportionment of liability. After the addition of interest, the judgment was satisfied and $1,397,854 was paid. Of this amount, Wausau paid $419,-356.20.

In the current lawsuit, Wausau seeks to be indemnified by Argonaut.

### The Parties' Contentions

Before reaching its conclusions, the Court will briefly set forth the parties' main contentions. Wausau's argument is fairly straightforward. According to Wausau, Jones was at no time Pelzer's private patient. Thus, Pelzer was acting as a "volunteer" in his treatment of Jones. This characterization is the heart of Wausau's claim. The Argonaut policy provides that, "as respects ... [a] volunteer, [the Argonaut policy] is to be considered the only valid insurance in force." According to Wausau, this clause serves to insulate it from liability.

To fit within the Argonaut policy's definition of volunteer, Wausau must establish two points; first, that Pelzer was acting within the scope of his duties or as authorized by the Hospital and second, that any compensation Pelzer received for the services he rendered to Jones was "incidental."

Wausau attempts to establish these points in the following manner. According to Wausau, the jury found that Pelzer acted within the scope of his duties. Wausau urges the Court to adopt the jury's finding. Moreover, Wausau observes that it is not necessary to show that the Hospital authorized Pelzer's acts because the policy contains the word "or," instead of "and." *See* Stipulated Facts, ¶ 10 ("... volunteers ... while acting within the scope of their duties *or* as authorized by the named insured") (emphasis added). Wausau describes the $8.00 Pelzer received from Medicaid as incidental. Wausau rests this view on the size

of the payment and the fact that Pelzer did not receive the money directly from Jones.

Argonaut mounts a robust defense to Wausau's claim. Argonaut interprets its policy in a manner that denies Pelzer the status of volunteer. It contends that to be a volunteer, Pelzer's actions must have been within the scope of his authority, and approved by the Hospital. Because Pelzer's acts were not so approved, Argonaut contends he cannot be a volunteer. This would take Pelzer outside the ambit of Argonaut's coverage. According to Argonaut, because Pelzer's attempt to discharge Jones was contrary to Hospital policy, the jury was incorrect in finding that Pelzer acted within the scope of his authority. Argonaut then proceeds to look to the second point Wausau must establish. Argonaut argues that the term "incidental" refers to compensation that comes from the Hospital. This position holds that a "volunteer" physician is one who provides services without charging a fee to the Hospital's clients, and acts without regard to compensation. Argonaut asserts that the billing of a patient is inconsistent with the concept of a volunteer. Hence, regardless of the amount received by Pelzer, the fact that he received any compensation from a non-Hospital source prevents him from being a "volunteer."

Argonaut also offers the defense of laches and unclean hands. Under this defense, Argonaut reasons that Wausau's failure to seek coverage under the Argonaut policy until the Jones lawsuit was well underway caused Argonaut severe prejudice. Argonaut argues that Wausau waited seven years to contact Argonaut regarding coverage for Pelzer, and during that time Argonaut's defense of the Hospital was formulated. Further, any failure by Wausau to know of the Argonaut coverage for Pelzer was due to Wausau's lack of an adequate investigation.

### DISCUSSION

I. *Dr. Pelzer's Status as a Volunteer Physician*

A. Incidental Compensation

The term "incidental" is not defined in the Argonaut policy. Indeed, during his

deposition, Benjamin Lavin, the Director of Claims and Legal Services at the Federation of Jewish Philanthropies Service Corporation, indicated that the term "incidental compensation" was never interpreted by the Federation prior to the commencement of this lawsuit. *See* Plaintiff's Ex. 7 at 104–05. The definition advanced by Lavin was that "incidental compensation" involved "private attendings, volunteering their time to clinic work, which usually lasts a few hours or more than a casual time wherein such cases a physician spending a few hours in a clinic would be compensated by the hospital for his time." *Id.* at 56–57. Lavin further testified that, "[t]o the best of my knowledge, the compensation referred to in the policy must come from the hospital, not from the patient." *Id.* at 102. The Court takes a suspicious view of Lavin's definition because it was formulated after the institution of Wausau's lawsuit. For its part, however, Wausau is unable to present any contrary proof as to how Argonaut has defined the term "incidental compensation." Thus, the Court will analyze the word "incidental," mindful of the fact that ambiguities in insurance contracts are construed against insurers. *See Ogden Corp. v. The Travelers Indemnity*, 681 F.Supp. 169, 173 (S.D.N.Y. 1988) (JFK); *Thomas J. Lipton, Inc. v. Liberty Mutual Insurance, Co.*, 34 N.Y.2d 356, 357 N.Y.S.2d 705, 708, 314 N.E.2d 37 (1974).

■ An examination of several leading dictionaries reveals that while the compensation received by Pelzer may be "nominal," it is clearly not incidental. The Compact Edition of the Oxford English Dictionary, ** ("Oxford") published in 1971 by the Oxford University Press defines incidental as, "[o]ccurring or liable to occur in fortuitous or subordinate conjunction with something else of which it forms no essential part; casual." Oxford, at 1401–02. A 1644 quote attributed to Milton by Oxford implies a lack of intentional behavior when something is incidental. *See id.* (Milton wrote of. "[T]hose incidental discourses which we have wandered into."). How-ever, Oxford further defines the term to mean, "[o]f a charge or expense: such as is incurred (in the execution of some plan or purpose) apart from the primary disbursements." When considered under the facts of this case, Pelzer's payment from Medicaid was the primary disbursement he received out of his treatment of Jones.

Webster's Third New International Dictionary, ("Webster's Third") published in 1961, defines incidental as, "subordinate, nonessential, or attendant in position or significance: as ... occurring merely by chance or without intention or calculation: occurring as a minor concomitant...." Webster's Third at 1142; *see also* Webster's New Collegiate Dictionary at 580 (1977). Similarly, the Second College Edition of The American Heritage Dictionary, ("the American Heritage") published in 1982 defines the word to mean, "[o]ccurring or likely to occur as an unpredictable or minor concomitant ... [or] [o]f a minor, casual or subordinate nature: *incidental expenses.*" American Heritage at 650 (emphasis in original).

Pelzer's receipt of $8.00 from Medicaid was not "incidental compensation." He was not paid due to some fortuitous, casual event that happened by chance and without intention. Pelzer intentionally sent a bill to Medicaid for the services he rendered. Indeed, Pelzer sought to discharge Jones from the Hospital because he doubted that Jones had Medicaid coverage. The fact that Pelzer sent a bill for $12.00 and was paid $8.00 does not change the Court's conclusion. The amount of Pelzer's payment, whether $8.00 or $8,000.00, was due to an intentional, affirmative act on his part. If the Argonaut policy contained the phrase "nominal payment," Wausau's argument might prevail, because an examination of how various dictionaries define "nominal" demonstrates that this term accurately describes Pelzer's payment. Generally, one of the definitions attributed to nominal is that of a small, trifling or insig-

** This volume is "compact" in print size, not in content. One is well advised to have a magnify-ing glass when using this dictionary.

nificant amount. *See* American Heritage at 845; Webster's New Collegiate Dictionary at 779; Webster's Third at 1534. The Court, however, declines to rewrite Argonaut's policy to substitute "nominal" for "incidental."

## B. The Scope of Pelzer's Authority

After hearing the evidence concerning Pelzer's conduct, a state court jury found his actions to be within the scope of his authority. Although his actions were against Hospital policy, they were done within his role as Chief of Plastic Surgery. The Court sees no reason to disregard the jury's finding.

However, regardless of whether Pelzer's actions were within the scope of his authority, he is not a "volunteer" as set forth in Argonaut's policy due to the Medicaid payment.

## II. *Argonaut's Laches Defense*

Even if Pelzer were a "volunteer," an independent ground exists to bar Wausau's claim. The defense of laches is available against equitable claims when "the plaintiff has inexcusably slept on his rights so as to make a decree against the defendant unfair." *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 65 (2d Cir.1983). Thus, Argonaut must establish that Wausau unreasonably delayed in seeking to invoke the Argonaut policy, and that this delay resulted in prejudice.

Wausau contends that it did not know until the *Jones* trial that Pelzer could have been covered by Argonaut. Wausau argues that the Hospital and the Federation never informed Pelzer of the potential coverage, and that Argonaut never informed Wausau of the potential coverage. The Court finds, however, that Wausau had knowledge of sufficient facts so that it may be deemed to have had constructive knowledge of the Argonaut policy. *See Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 535 (2d Cir. 1964); *Grant Airmass Corp. v. Gaymar Indus., Inc.*, 645 F.Supp. 1507, 1515 (S.D.N.Y.1986). The events giving rise to the Jones' lawsuit took place from October, 1973 to January, 1974. Her state court malpractice action was filed in October, 1975; the trial began on May 6, 1982 and Wausau sought to invoke the Argonaut policy after the trial was three weeks old.

Wausau's failure to make proper inquiry into possible additional coverage for Pelzer is clear from a reading of Roger Nichols' deposition. Nichols is a Wausau claims supervisor who was directly responsible for handling Pelzer's position vis-a-vis the *Jones* lawsuit. Nichols testified that,

[i]f the circumstances surrounding the particular claim gave us [Wausau] any reason to suspect that there was coverage under the hospital's insurance policy, we would write to the hospital carrier requesting a copy of their policy and offer to supply our own policy if they wished to review it.

Defendant's Ex. J at 152. Despite knowing of Jones' allegations and Pelzer's role with the Hospital, during 1976 Wausau failed to ask the Hospital about possible coverage for Pelzer under the Hospital's insurance policy. *Id.* at 155. Moreover, despite knowing at some point "that a number of the Federation hospitals were covered under a unique policy written by Argonaut Insurance Company which provided much more extensive coverage for staff members than any other policy [Wausau had] ever seen," *id.* at 204, Wausau failed to communicate directly with Argonaut from 1976 to May 5, 1982 about possible coverage for Pelzer. *Id.* at 185. Wausau was well aware of Pelzer's exposure, *see* Defendant's Ex. M5, and the prospects at trial. In fact, in a January 22, 1980 memorandum to the Home Office, Nichols outlined the facts of Jones' claim and noted that, "[c]learly, this is a potentially explosive situation...." Defendant's Ex. M4. Yet, Wausau still failed to make inquiries of either the Hospital or Argonaut.

The timing of Wausau's ultimate attempt to invoke the Argonaut policy is revealing, and demonstrates the prejudice it caused Argonaut. As noted above, the trial began on May 6, 1982, and Wausau sent Argonaut a mailgram on May 24, 1982 stating that Pelzer was "entitled coverage" under Argonaut's policy with the Federation. In

**1086**

the telegram, Wausau requested that Argonaut "join in the defense of Dr. Pelzer...." Defendant's Ex. M15. Wausau's telegram was sent after Pelzer testified in the trial. Interestingly, Nichols' notes indicate defense counsel informed him that Pelzer's performance on the stand was "dismal," *see* Defendant's Ex. K at 115, Ex. M11, and that Pelzer was terrified to go to court. *Id.* M10. Moreover, Nichols knew that Pelzer's performance on the stand had an impact on the case's prospects. *See* Defendant's Ex. K at 117. By the time Wausau sent the mailgram it was abundantly clear that the trial presented a conflict regarding liability between Pelzer and the Hospital. Thus, by May 24, 1982, Argonaut had prepared a trial strategy for the Hospital, was in the process of implementing it, and Pelzer had already testified. Even were Argonaut to have had a duty to defend Pelzer, there is significant prejudice caused by Wausau's unjustifiable delay.

To conclude, Wausau seeks indemnification for payment of its share of the liability resulting from the *Jones* lawsuit. Since "indemnity is rooted in principles of equity," *City of New York v. Keene Corp.*, 132 Misc.2d 745, 505 N.Y.S.2d 782, 785 (Sup.Ct.1986), *aff'd*, 129 A.D.2d 1019, 513 N.Y.S.2d 1004 (1st Dep't.1987), the defense of laches is available. The Court finds that the elements of the defense are met by Argonaut, and that Wausau's claim is barred.

### CONCLUSION

The Court finds in favor of Argonaut. Because Pelzer's compensation was not "incidental," he does not qualify as a volunteer and is not entitled to coverage under Argonaut's policy. In addition, Argonaut's laches defense bars any claim.

Judgment is entered in favor of the defendant and the case is ordered removed from the active docket of this Court.

SO ORDERED.