**UNITED STATES of America, ex rel., TAXPAYERS AGAINST FRAUD, a non-profit corporation and Christopher Urda**

v.

**LINK FLIGHT SIMULATION CORPORATION and Singer Company and Cae–Link Corporation Mesa Holding Limited Partnership.**

Civ. No. HM–88–3408.

United States District Court, D. Maryland.

May 24, 1989.

Robert E. Montgomery, Jr., Erika A. Kelton, Paul, Weiss, Rifkind, Wharton & Garrison, Washington, D.C., Stuart Robinowitz, Leslie G. Fagen, Paul, Weiss, Rifking, Wharton & Garrison, New York City, John R. Phillips, Carlyle W. Hall, Jr., Hall & Phillips, Los Angeles, Cal., Ira L. Oring, U.S. Dept. of Justice, Baltimore, Md., Michael B. Suessman, Civ. Div., Dept. of Justice, Washington, D.C., for plaintiffs.

M. Rosewin Sweeney, Piper & Marbury, James A. Dunbar, Venable, Batjer & Howard, Baltimore, Md., Carole L. Fern, Lorraine K. Rak, John E. Hoffman, Jr., Shearman Sterling, Morton M. Maneker, Charles S. Simms, Bruce Fader, Proskauer, Rose, Goetz & Mendelsohn, New York City, Wm. Alden McDaniel, Jr., Murphy & McDaniel, Baltimore, Md., Michael P. Graham, Baker & Botts, Houston, Tex., Sidney G. Leech, Goodell, Devireis, Leech & Gray, Baltimore, Md., for defendants.

## MEMORANDUM

HERBERT F. MURRAY, Senior District Judge.

Now before the Court are the Motion to Vacate Temporary Restraining Order that has been filed by defendant Singer Corporation and the Motion to Clarify the Temporary Restraining Order that has been filed by the relators, Taxpayers Against Fraud and Christopher Urda.[1] The Court has reviewed the papers in this case and heard oral argument from counsel at a hearing in open court on May 10, 1989. The reasons for the Court's rulings in its Order dated May 22, 1989 are as follows.

### I. *The Underlying Suit—the Wrongful Conduct*

The following alleged facts are contained in the First Amended Complaint and other papers submitted by the government. This suit by the government arises out of the performance of various military contracts by Link Flight,[2] in its various incarnations, from at least 1980 through 1988. Link Flight produced military flight simulators for the government to use in training pilots. Michael J. Doyle, an auditor for the Defense Contract Audit Agency states in his Declaration (Exhibit 1 to the government's Motion for Preliminary Injunction) that he has discovered that Link Flight artificially and fraudulently inflated the contract prices it submitted to the government. Under the applicable federal contracting regulations,[3] Link Flight was required to submit its best estimate of the costs that would be incurred in performance of the contract. However, Link Flight intentionally failed to do this. Instead, it would work up its best estimate and record this on one set of documents which was kept within the company. Then, it would pad this amount by between 4% and 17% (usually in the 7% to 10% range) and record the artificially-inflated padded amount on another set of documents, which were fraudulently submitted to the government as the company's best estimate of its costs. The padding was referred to in internal company documents as "negotiation loss" or "management reserve." An example of internal company documents comparing the true estimates and the padded estimates, and documents reflecting submission of the padded estimates to the government, were attached to the Doyle Declaration, and support the government's contentions in this regard. Through this dual-accounting method, Link Flight was able to evade government contract regulations and inflate its profit (and the government's cost) on the government contracts. The government has brought suit under the False Claims Act, 31 U.S.C. § 3729 *et seq.* and for common law fraud, unjust enrichment, payment under mistake of fact, and breach of contract.

### II. *Why the Injunction is Necessary— the Corporate Transactions*

During the majority of the time in question, Link Flight was the Link Flight Simulation Division of Singer Company ("the Division"). In November, 1987 through April, 1988, Paul Bilzerian accomplished a hostile takeover of the Singer Company. His plan was to buy the entire company, then make his profit by selling off all of Singer's assets. *See, e.g., New York Times* article, Exhibit 6. Pursuant to this plan, Link Flight was incorporated as Link Flight Simulation Corporation ("the Corporation"), a subsidiary of Singer Company ("Singer"), and then sold to CAE Industries, which in turn formed CAE–Link Corporation ("CAE–Link"). However, Singer probably remains liable for the fraudulent actions committed by Link Flight while it was still the Division, pursuant to a contract it entered into with the government and the Corporation, "the Novation Agree-

---

**1.** The government also filed a Motion for Expedited Discovery, but the Court has been advised that the parties have reached a discovery agreement mooting the motion.

**2.** "Link Flight" is used in this memorandum to refer generally to all three successive corporate forms of the business. The different forms are given specific designations below.

**3.** The Federal Acquisition Regulation and its predecessors, the Defense Acquisition Regulation and the Armed Services Procurement Regulation.

ment", in which the government expressly reserved its rights against Singer, ¶ (b)(5), and in which Singer guaranteed payment of all liabilities assumed by the Corporation under the Novation Agreement, ¶ (b)(8).

The government alleges that the padding amounted to $77 million, which amount may increase if further investigation uncovers more fraud. When trebled pursuant to the False Claims Act, the total potential liability is thus at least $231 million.

Pursuant to Bilzerian's original plan, Singer is continuing to sell off its assets. At the same time, it is re-paying the entities that helped finance Bilzerian's takeover. Thus, while Singer's assets prior to the takeover were $1.58 billion, they are now only $445 million. Moreover, Singer is presently a defendant in at least three other lawsuits arising out of the takeover and related transactions, which seek a total of $342 million, not including punitive damages. Singer's shareholder's equity is presently between $50 million and $80 million.

Since the unsealing of the complaint in the instant case on March 13, 1989, the government has been attempting to negotiate a voluntary injunction with Singer. *See* Declaration of Michael Suessman (the government's attorney), Exhibit 7 to the Motion for Preliminary Injunction and attachments. However, despite assuring the government that it would take no action to reduce its capital, Exhibit 7, attachment A, on March 22, 1989 Singer re-purchased $30 million worth of stock from its shareholders.

Thus, the continuing dismantling of Singer, the various suits against it, and Singer's distribution of its assets to its principals, all place Singer's ability to satisfy a judgment in the instant case in serious jeopardy, leading the government to move for a temporary restraining order and a preliminary injunction against further distribution and dissipation of Singer's assets.

### III. *The Temporary Restraining Order*

On May 2, 1989, the government filed Motions for Temporary Restraining Order ("TRO") and for Preliminary Injunction.

The Honorable Frederic N. Smalkin of this Court, sitting as chambers judge, held a hearing on the Motion for TRO that afternoon, at which all parties were represented. Judge Smalkin found:

(1) that the United States has raised grave or serious questions on its claim that the contracting practices of Singer Company's former Link Flight Simulation Division and its proposals of costs to the government led to the submission of false claims to the government and the payment of those claims; and (2) that the probability of irreparable injury to the United States if the restraining order does not issue outweighs the likelihood of harm to Singer Company if the order is granted, in that the continued reduction of the assets of Singer Company could cause irreparable harm to the ability of the United States to collect a judgment in this matter, while the grant of the order to preserve the status quo will not harm Singer Company; and (3) that the public interest will be served by the grant of the restraining order.

Judge Smalkin accordingly ordered

that defendant Singer Company, its officers, agents, servants and employees, and all those persons in active concert or participation with them who receive actual notice of this Order, are enjoined from taking any action beyond negotiations [*] to dispose, sell, distribute, transfer, or encumber the assets of Singer Company, except for the payment of business indebtedness incurred in the ordinary course of business, including salaries and legal fees, except with leave of this Court after prior notice to all parties.

---

[*] "Negotiations" includes the signing, but not the performance, of contracts.

The government initially contends that the Motion to Vacate should be denied because it constitutes impermissible relitigation of matters that were presented to Judge Smalkin. In support of this position, the government cites cases which uphold a district court's denial of a motion to modify a preliminary injunction. These cases are thus not directly on point in the present circumstances. The Court finds that (1)

the federal policy favoring deciding issues on their merits; and (2) basic fairness to Singer given the restrictive nature of the TRO and its issuance on short notice, both militate in favor of deciding the Motion to Vacate on its merits.

## IV. *The Blackwelder Furniture Test*

Singer contends that the TRO should not have issued because the test for such orders has not been satisfied in this case.

In the Fourth Circuit,

Four factors enter into the determination of whether to grant or to withhold interim injunctive relief: (a) plaintiff's likelihood of success in the underlying dispute between the parties; (b) whether plaintiff will suffer irreparable injury if interim relief is denied; (c) the injury to defendant if an injunction is issued; and (d) the public interest.

*North Carolina State Ports Authority v. Dart Containerline Co.*, 592 F.2d 749, 750 (4th Cir.1979).

The two more important factors are those of probable irreparable injury to plaintiff without a decree and of likely harm to the defendant with a decree. If that balance is struck in favor of plaintiff, it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success.

*Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir.1977).

■ The Court finds that application of this test strongly favors issuance of the TRO in this case.

First, the balance of hardships tips decidedly in favor of the government. The current management of Singer has been pursuing a calculated strategy of disposing of Singer's assets in order to maximize profit from the takeover of the corporation. This has resulted in drastic reductions in Singer's total assets and net worth, as Singer's divisions (such as Link Flight) have been auctioned off piecemeal. Singer's current management has shown no intention to maintain the company as an ongoing business enterprise. Moreover, Singer is threatened by numerous lawsuits, throwing

further doubt on its continuing viability during the pendency of this litigation. In these unique circumstances, it is probable that in the absence of an injunction Singer would have no assets left to satisfy a judgment in this case, irreparably injuring the government.

Singer argues that there is no possible irreparable injury to the government necessitating the TRO, because codefendant CAE–Link has sufficient assets to satisfy any judgment, as evidenced by the $560 million price for which CAE bought Link from Singer. Singer relies on provisions in the Novation Agreement under which CAE–Link assumed liability for all claims against Singer arising out of the government contracts.

This argument is disingenuous, because it ignores other provisions of the Novation Agreement under which (1) Singer guaranteed payment of all liabilities that CAE–Link assumed under the Novation Agreement; and (2) the government expressly reserved all its rights against Singer. Indeed, Singer appears to be primarily liable, as Link was simply a division of Singer during the vast majority of the time period in which the alleged frauds took place. Moreover, CAE–Link contests its liability for fraudulent activities that occurred while Link Flight was owned by Singer. It is premature to sort out the relative potential liabilities of the various defendants at this stage of the litigation. The situation is quite similar to *Foltz v. U.S. News & World Report*, 760 F.2d 1300, 1308 n. 8 (D.C.Cir.1985), where the District of Columbia Circuit held:

It simply cannot be assumed that, if plaintiffs' claims have merit, all named defendants would be held liable, nor that their respective resources could be added up to satisfy the plaintiffs' total damages claim. It is too soon to tell which, if any, of plaintiffs' claims will prevail and against whom. The possibilities, being legion, are simply too varied. For example, it is possible that only a minority of defendants will have the issue of liability determined adversely to them, thus leaving other defendants entirely vindicated.

Hence, we cannot agree that arithmetical aggregation of varying abilities to pay will suffice for purposes of irreparable harm analysis.

Therefore, the ability of Singer to pay a judgment is very relevant, and the government could be irreparably injured if this ability is impaired.

Singer asserts that it is being irreparably injured by the TRO. This is true insofar as Singer may lose opportunities to engage in certain extraordinary transactions. However, Singer is still perfectly able to engage in its ordinary course of business under the TRO, and is prevented merely from dissipating itself. As in *Tri–State Generation and Transmission Assoc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 357 (10th Cir.1986), this defendant "will suffer little—if any—injury, even if the sale is never completed. The assets will still be available for sale to another purchaser," if Singer remains solvent at the conclusion of this litigation. This temporary hardship is thus strongly outweighed by the likelihood of permanent harm to the government.

Having concluded this much, as to the merits of the government's case it is necessary only to find that it raises serious or grave questions; the government need not demonstrate a likelihood of success on the merits. *Blackwelder, supra.* There can be little doubt that it does raise such questions. The government alleges a classic procurement fraud scheme, entailing the submission of falsely inflated estimates to government contracting agents, supported by an internally-maintained dual accounting system. The gist of Singer's challenges on this point are (a) the government's position is based on an affidavit that is inadmissible in evidence; (b) the affidavit is conclusory and supported by only three documents out of an alleged one hundred boxes of documents; (c) "[n]o testimony is offered by any witness with knowledge of the cost estimating process or the purpose of the various records or the meaning of terminology"; (d) a conclusory assertion that the practice reflected in these three documents "is at least as consistent with good management as fraud"; and (e) Singer's profits on the contracts in question have been reasonable and not extraordinary, generally falling in the 14–18% range.

■ These challenges are unpersuasive because, in order: (a) the Court may consider inadmissible affidavits in a preliminary injunction proceeding, *Federal Savings & Loan Insurance Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir.1987); (b) the Court expects that the supportive character of the hundreds of boxes of documents has been fleshed out during discovery and will be presented more fully in connection with the Motion for Preliminary Injunction; (c) as the government points out, its position is corroborated by the original complaint filed by relator Christopher Urda, a former Singer bid and pricing administrator with purported knowledge of the fraudulent practice alleged; (d) to the contrary, the documents do seem to show that Singer worked up two sets of estimates, then submitted the higher ones to the government; and (e) Singer's "reasonable profits" argument displays the classic logical fallacy of post-hoc reasoning: just because Singer's ultimate profits may have been reasonable, that does not show that Singer did not attain those profits fraudulently.

Finally, the public interest heavily favors the TRO, as the public is more clearly served by redressing fraud in government contracting and preserving the government's ability to recoup monies fraudulently paid than it is by a private company auctioning off its parts so that the profits of a corporate raider may be maximized.

### V. *Power to Issue the Injunction*

Having determined that it was proper for the TRO to issue under the usual standard, the Court now turns to the question of its power to order the requested relief. Singer, relying on dicta in *DeBeers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945) and on the Fifth Circuit case of *In re Fredeman Litigation*, 843 F.2d 821 (5th Cir. 1988), contends that the Court lacks this power. The government, of course, contends otherwise.

In *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940), the plaintiffs brought suit under the Securities Act of 1933 for rescission of a fraudulent sale and restitution of the consideration paid. Plaintiffs alleged that the principal defendant was "insolvent and threatened with many law suits, that its business [was] virtually at a standstill because of unfavorable publicity, that preferences to creditors [were] probable, and that its assets [were] in danger of dissipation and depletion." 311 U.S. at 285, 61 S.Ct. at 232. On these grounds, the plaintiffs sought and obtained a preliminary injunction restraining one of the defendants from transferring or otherwise disposing of certain assets belonging to other defendants that were in its possession. The Supreme Court upheld the injunction. The Court first examined the terms of the Act's grant of jurisdiction, which provided jurisdiction "of all suits in equity and actions at law brought to enforce any liability or duty created by the subchapter." The Court held that "[t]he power *to enforce* implies the power to make effective the right of recovery afforded by the Act." 311 U.S. at 288, 61 S.Ct. at 233 (original emphasis). The Court then held that "the injunction was a reasonable measure to preserve the status quo pending final determination of the questions raised by the bill.... As already stated, there were allegations that Independence was insolvent and its assets in danger of dissipation or depletion. This being so, the legal remedy against Independence, without recourse to the fund in the hands of [the enjoined defendant], would be inadequate." 311 U.S. at 290, 61 S.Ct. at 234.

In *DeBeers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566 (1944), the government brought suit under the Sherman Act and the Wilson Tariff Act against various foreign corporations engaged in the diamond business and individuals associated with those corporations, to restrain illegal trade practices. The government also sought and obtained a preliminary injunction freezing those assets of the defendants that were in the United States, *pendente lite,* as the defendants otherwise could quickly withdraw those assets from the United States and render any final decree unenforceable. The Court again turned to the terms of the jurisdictional grant of the Act in question, which conferred jurisdiction only "to prevent and restrain violations of this act." The only way in which the frozen assets could be brought into the case would be to enforce a contempt judgment for violation of an injunction restraining conduct that the district court might have issued in the future, a chain of events so attenuated that the Court took pains to lay out the eight separate possible but uncertain future events that would all have to occur. *Id.* at 219, 65 S.Ct. at 1133. As the District Court's "only power [under the Sherman Act] is to restrain the future continuance of actions or conduct intended to monopolize or restrain commerce," *id.* at 219–220, 65 S.Ct. at 1134, the injunction in question "deals with property which in no circumstances can be dealt with in any final injunction that may be entered." *Id.* at 220, 65 S.Ct. at 1134. The Court thus held that while "[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally, the injunction in question could not issue as it was not of this character." *Ibid.* The Court distinguished *Deckert* on the ground that the injunction there "was granted with respect to a fund or property which would have been the subject of the provisions of any final decree in the cause." *Ibid.* Thus, the holding in the *DeBeers* case turned on the dichotomy between the power over conduct that the District Court did have, and the power over property that it did not have, but nevertheless had exercised.

What Singer hangs its hat on is sweeping dicta found at the end of the Court's opinion:

To sustain the challenged order would create a precedent of sweeping effect. This suit, as we have said, is not to be distinguished from any other suit in equity. What applies to it applies to all such. Every suitor who resorts to chancery for any sort of relief by injunction may, on a

mere statement of belief that the defendant can easily make away with or transport his money or goods, impose an injunction on him, indefinite in duration, disabling him to to use much of his funds or property as the court deems necessary for security or compliance with its possible decree. And, if so, it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action. No relief of this character has been thought justified in the long history of equity jurisprudence.

*Id.* at 222–23, 65 S.Ct. at 1135. First, this was simply dicta, superfluous to the Court's holding elucidated above. Secondly, this passage, particularly the fourth sentence, read in the context of the Court's decision as a whole, refers to situations such as the one there presented where the principal relief sought is a permanent injunction restraining conduct and the motion for preliminary injunction seeks to restrain property to secure compliance with that principal relief. Finally, the last two sentences set forth a generalized "parade of horribles" which does not account for cases founded on fraud where there is a realistic threat of insolvency, as in *Deckert* and subsequent cases listed below.

The Court returned to the question of freezing assets *pendente lite* by means of preliminary injunction in *United States v. First National City Bank*, 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965). In that case, the government sought to collect unpaid taxes owed to it by one of the defendants, Omar, S.A., a Uruguayan corporation. Omar had substantial assets in an account at defendant First National City Bank ("Citibank")'s Montevideo branch. As Omar was alleged to be removing its assets from the United States, the government sought and obtained an injunction restraining Citibank from transferring or disposing of any property or rights to property held for the account of Omar, in the United States or elsewhere. Again the Court examined the jurisdictional grant,

which gave the District Court power to grant injunctions "necessary or appropriate for the enforcement of the internal revenue laws." The Court first noted that "our review of the injunction as an exercise of the equity power granted by 26 U.S.C. § 7402(a) must be in light of the public interest involved: 'Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved,'" *id.* at 383, 61 S.Ct. at 531 (citations omitted), a principle which applies with full force to the instant case against Singer. The Court then held, "[t]he temporary injunction issued by the District Court seems to us to be eminently appropriate to prevent further dissipation of assets.... Unlike *DeBeers Mines v. United States*, 325 U.S. 212 [65 S.Ct. 1130], there is here property which would be 'the subject of the provisions of any final decree in the cause.' *Id.*, [at] 220 [65 S.Ct. at 1134]. We conclude that this temporary injunction is 'a reasonable measure to preserve the status quo' (*Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290 [61 S.Ct. 229, 234]) pending service of process on Omar and an adjudication of the merits." *Ibid.*

Thus, the Supreme Court did not read *DeBeers* to prohibit freezing assets to forestall the imminent danger of a defendant becoming judgment-proof, as Singer does. Rather, it found the crucial point of *DeBeers* to be the impermissible freezing of property that could not be directly reached by a final judgment that could restrain only conduct. In *Deckert* and *Citibank*, however, the frozen assets *could* be used to satisfy a future judgment imposing monetary liability. Nor did the dissent in *Citibank* read *DeBeers* as Singer does. Justice Harlan found the crucial point of *DeBeers* to be the "remoteness" of any possible monetary judgment in that case and in *Citibank* itself, and not an absolute prohibition on the type of interlocutory relief that was sought there and here. *Citibank*, 379 U.S. at 398–99, 85 S.Ct. at 533–34. Justice Harlan distinguished *Deckert* on four grounds: (1) it involved no internation-

al problems; (2) the court had personal jurisdiction over all parties; (3) there was no question of power to enforce a judgment against the frozen funds; and (4) there was no remoteness problem as the only contingency on which future use of the frozen assets depended was the plaintiff's winning the suit, *id.* at 399, 85 S.Ct. at 539, all of which place the instant case against Singer in line with *Deckert.*[4]

■ Numerous circuit courts have allowed restrictions on a defendant's ability to transfer its assets, to preserve the efficacy of a future monetary remedy. These cases have involved either allegations of fraudulent conduct,[5] or corporate restructuring and the sale of corporate assets,[6] both of which are involved here.

Singer places substantial reliance on two lower court opinions, *In re Fredeman Litigation*, 843 F.2d 821 (5th Cir.1988) and *Prestige Wine & Spirits, Inc. v. Jules Robin, S.A.*, 686 F.Supp. 103 (D.Md.1988), neither of which undermines the injunctive relief requested in this case. *Fredeman* relied on the *DeBeers* dicta to strike down a preliminary injunction issued to secure a damages remedy in a civil RICO action. However, the *Fredeman* court expressly distinguished cases such as the instant one in which equitable relief is sought, 843 F.2d at 825, and cases in which the defendant was about to become insolvent, citing *Deckert* and *Teradyne, id.* at 828.[7] The Court finds that this "insolvency" exception is also applicable to the case *sub judice.* As in *Deckert*, Singer is threatened by numerous lawsuits, preferences to creditors are

probable, and its assets are in danger of dissipation and depletion. Singer's current management has engaged in a calculated and drastic process of depletion of the corporation's assets, and has evinced no intention to maintain the corporation as an ongoing business enterprise. Singer "is for all practical purposes in the process of an orderly liquidation." *Atlas*, 454 F.2d at 278. It is this set of circumstances that most strongly compels the TRO.

Nor does *Prestige Wine and Spirits* aid Singer's case. Judge Niemeyer did not hold that the requested injunction *could* not issue, only that it *would* not issue, as the plaintiff there had failed to satisfy the *Blackwelder* test, particularly because the defendant's amenity to suit in a French court forestalled irreparable injury to the plaintiff.

Nor is there merit in Singer's argument that the particular assets frozen must somehow be a *res* in question in the suit. While it is true that some of the cases above did involve freezing the *res* in question, one need look no further than *Citibank* for an example of a case in which the frozen assets were not a *res* in question.

In the instant case, then, the Court had and has the power to issue the injunctive relief requested. The government seeks restitution of monies that allegedly were fraudulently obtained by Singer and the other defendants, under various equitable theories as well as legal ones. The assets of Singer would be the direct subject of a final decree in this cause, pursuant to this Court's power to award a monetary reme-

---

**4.** Singer cites *Citibank* at 385, 85 S.Ct. at 532 for the proposition "*DeBeers* forbids injunctions to preserve a litigant's ability to secure damages at law." This is a misstatement; there is nothing in *Citibank* that supports that proposition.

**5.** *In re Feit and Drexler, Inc.*, 760 F.2d 406 (2d Cir.1985) (citing *Citibank* ); *Int'l. Controls Corp. v. Vesco*, 490 F.2d 1334, 1347 (2d Cir.1974); *Securities and Exchange Comm'n v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105–06 (2d Cir.1972); *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 98 (6th Cir.1982) (distinguishing *DeBeers* on the ground that the property restrained by the injunction "may well be dealt with by a final decree in equity"); *Fed. Trade Comm'n v. H.N. Singer, Inc.*, 668 F.2d

1107, 1112 (9th Cir.1982); *Foltz v. U.S. News & World Report*, 760 F.2d 1300, 1309 (D.C.Cir. 1985) ("an equitable remedy designed to freeze the *status quo* ... would be entirely in keeping with the principles that undergird equity jurisprudence").

**6.** *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43 (1st Cir.1986) (citing *Deckert* ); *Mutual Benefit Life Insurance Co. v. Atlas Financial Corp.*, 454 F.2d 278 (3d Cir.1972); *Lynch Corp. v. Omaha Nat'l Bank*, 666 F.2d 1208 (8th Cir.1981); *Tri–State Generation and Transmission Assoc. v. Shoshone River Power, Inc.*, 805 F.2d 351 (10th Cir.1986).

**7.** The *Fredeman* court did not discuss or cite *Citibank.*

dy. The TRO is "eminently appropriate to prevent further dissipation of assets" presently in the possession of Singer, *Citibank*, and is "a reasonable measure to preserve the status quo pending final determination of the questions raised by the [complaint]," *Deckert.* The Court has therefore denied the Motion to Vacate.

## VI. *Relators' Motion to Clarify the TRO*

■ A dispute has arisen between the parties as to the proper interpretation of the footnote in the TRO issued by Judge Smalkin that reads: " 'Negotiations' include the signing, but not the performance, of contracts."

The government interprets this phrase to mean that any rights to Singer's assets obtained by third parties who sign contracts with Singer would be subordinate to any interest obtained by the government as a result of this suit. Singer interprets this phrase to mean that such rights would be superior to those of the government. The government has taken the position that, as its interpretation is obviously correct, no motion to clarify the TRO is necessary. However, the relators in this case, Christopher Urda and Taxpayers Against Fraud, have not been so content to leave these conflicting interpretations unresolved, and have filed a motion to clarify the TRO. In their brief, they essentially urge the Court to explicitly adopt the government's interpretation of the TRO.

The government's interpretation is the correct one. First, Singer's interpretation would gut the TRO, as it could effectively insulate itself from a judgment by giving superior contractual rights to others, or even its own officers and shareholders. Second, the government's interpretation is more consistent with Judge Smalkin's remarks at the TRO hearing:

Mr. Suessmann: Your honor, one question that is rather relevant. If a contract is entered into, does that affect the books of the company at the time?

The Court: Don't ask me. It depends what the contract says.

Mr. Suessmann: Well, it may be governed by the rules of accounting with the company.

The Court: Well, it may be, but it would have to be fully disclosed to the contracting parties. **It is subject to this particular order** and, therefore, carried as a contingency, and I don't think it would affect the book value except as a contingency, but even negotiations do that.

All right, I put a footnote here that defines negotiations as follows: negotiations include the signing, but not the performance of contracts. Okay?

Mr. Burack: That is fine on that point, your honor.

The Court: All right.

Entered this 2nd day of May 1989 at 1710 hours and served by hand in open court on all counsel including counsel for Singer this date.

Transcript at p. 30, line 23– p. 31, line 17 (emphasis supplied). Third, consultations with Judge Smalkin have confirmed that the government's interpretation is the correct one. The loophole in the TRO that is perceived by Singer is an imaginary one.

The Court also agrees with relators' contention that debt repayment to the investor group that financed the takeover is outside the scope of Singer's ordinary course of business as contemplated by the TRO, as they have little or nothing to do with Singer's ordinary business operations. The Court has therefore signed the proposed order submitted by the relators, to eliminate the uncertainty that seems to have arisen.

## VII. *Extension of the TRO*

At the request of Singer, the hearing on the Motion for Preliminary Injunction was moved from May 10, 1989 to May 25, 1989, to accomodate a change of counsel for Singer and to give new counsel adequate time to prepare for that hearing. Accordingly, at the hearing on May 10, 1989, Singer, while careful not to be construed as abandoning its Motion to Vacate, consented to extension of the TRO until the May 25, 1989 hearing on the Motion for Preliminary Injunction in the event that its Motion to

Vacate was denied. As that eventuality has come to pass, the TRO has been extended by consent to and including May 25, 1989.