**CAE INDUSTRIES LTD., CAE–Link Corporation, and Allen Holdings Corporation, Plaintiffs,**

v.

**AEROSPACE HOLDINGS COMPANY, the Singer Company, and Paul A. Bilzerian, Defendants.**

**No. 89 Civ. 2845 (CBM).**

United States District Court, S.D. New York.

Nov. 1, 1989.

See also 116 B.R. 31.

Shearman & Sterling, New York City (Carole L. Fern and Lorraine K. Rak, of counsel), for plaintiffs CAE Industries Ltd., CAE Link Corp. and Allen Holdings Corp.

Proskauer, Rose, Goetz & Mendelsohn, New York City (Bruce E. Fader, Bradley I. Ruskin and Stuart L. Melnick, of counsel), for defendants Aerospace Holdings Co., the Singer Co. and Paul A. Bilzerian.

## MEMORANDUM OPINION

MOTLEY, District Judge.

### I. Introduction

Plaintiffs CAE Industries, CAE Link Corporation and Allen Holdings Corporation (hereinafter referred to as "the plaintiffs") bring this action against defendants Aerospace Holdings Company, the Singer Company, and Paul A. Bilzerian (hereinafter referred to as "the defendants") alleging claims pursuant to the Securities Exchange Act, the Racketeer Influenced and Corrupt Organizations Act, the United States Arbitration Act (hereinafter referred to as the "FAA"), and other federal statutes, as well as pendent state law claims.

Plaintiffs have moved to compel arbitration, to enjoin the defendants from proceeding in a Florida federal district court, to enjoin defendants from disposing of Singer's assets, and to secure a letter of credit from defendants pending arbitration and litigation. Plaintiffs assert that equitable relief is required to preserve the status quo by enforcing its security pending arbitration and litigation due to defendants' allegedly deteriorating condition. Plaintiffs do not press their request for a temporary restraining order enjoining disposition of Singer's assets at the present time because a temporary restraining order is already in place in another related lawsuit, entered by a federal judge in Maryland.[1]

---

1. A temporary restraining order, followed by a preliminary injunction, was entered by the Honorable Frederic N. Smalkin on May 2, 1989 in the case titled *United States v. Link, et al.*, 722 F.Supp. 1248 (D. Maryland 1989). The order restrains:

Singer Company, its officers, agents, servants and employees and all those persons in active concert or participation with them ... from taking any action, beyond negotiations, to dispose, sell, distribute, transfer, or encumber the assets of Singer Company, except for the payment of business indebtedness incurred in

Defendants argue that the parties did not agree to arbitrate the principal matters in dispute; they maintain that judicial resolution of those principal disputes will render unnecessary the resolution of any narrower matters properly within the scope of the section of the agreement upon which plaintiffs rely in their motion to compel arbitration. Defendants also argue that CAE is not entitled to the letter of credit it requests since there has been no disposition of Singer's assets to the present Singer partners who now own Singer.

There are, therefore, several issues before the Court: whether to compel arbitration, whether to enjoin defendants from proceeding in another court, and whether to require defendants to furnish a letter of credit to plaintiffs pending arbitration and litigation. Due to their collective complexity, each issue will be treated separately.

## II. The Facts

Pursuant to an Agreement of Purchase and Sale, dated July 8, 1988 (hereinafter referred to as the Agreement), between CAE and Aerospace Holdings Company, subsidiaries of CAE acquired and CAE subsidiaries (plaintiffs CAE–Link and Allen Holdings) own, all of the issued and outstanding capital stock of Aerospace's former wholly-owned subsidiaries, Link Flight Simulation Corporation, Link Tactical Military Simulation Corporation, Allen Holdings Corporation, and Link Training Services Corporation (collectively, the Link Companies). CAE is a Canadian corporation; Aerospace is a wholly-owned subsidiary of Singer, a Delaware corporation.

On the morning of April 26, 1989, plaintiffs commenced the present action. The corporate defendants, Singer and Aerospace, commenced two declaratory judgment actions in Florida (hereinafter collectively referred to as the Florida actions) within thirty-six hours of the action commenced by plaintiffs in this court. Defendants brought one action in the United States District Court for the Middle District of Florida, Tampa Division, on April 26th. Defendants brought another action in a Florida state court on April 27th.

Plaintiffs received a copy of the complaint filed in the Florida state court on May 3, 1989 at its corporate headquarters in Toronto. Plaintiffs then removed the state court action to the United States District Court for the Middle District of Florida, Tampa Division. Plaintiffs have moved this court for an order enjoining defendants from proceeding with the Florida actions in view of the litigation previously commenced in this court.

As noted above, pursuant to an Agreement of Purchase and Sale, dated July 8, 1988 between CAE and Aerospace, all of the issued and outstanding capital stock of Aerospace's former wholly-owned subsidiaries, the Link Companies, were acquired by CAE. On August 22, 1988 the stock purchase Agreement initially closed. The total amount transferred to Aerospace was $560,000,000, subject to a post-closing purchase price adjustment (the Purchase Price Adjustment). The Purchase Price Adjustment was to be determined through a process set out at Section 1.03 of the Agreement which includes a five-step accounting process.

Section 1.03 provides that after the initial closing, CAE is to receive a Purchase Price Adjustment to the extent that the amount of the defined term "Tangible Net Investment" differed from the sum of $229,500,-000, which was the Estimated Tangible Investment on which the $560,000,000 purchase price was based. Furthermore, five days after the conclusion of what plaintiff refers to as the "arbitration" process, a Supplemental Closing will be held, according to the agreement.

Section 1.03 also provides that within 45 days after closing, CAE is to receive from Aerospace an audited Closing Date Balance Sheet, prepared in accordance with generally accepted accounting principles (GAAP), audited and certified by Peat, Marwick Main (PMM), Singer's auditors. Following

the ordinary course of business, including salaries and legal fees, except with leave of this

Court after prior notice to all parties.

that, the buyer, CAE, was to have the opportunity to have its own public accountants examine the work papers. In addition, after delivery of the Closing Date Balance Sheet by Aerospace, CAE, according to the agreement, was to have 20 days to present in writing to the seller any objections CAE may have to any of the matters set forth. Then, if CAE has objections which cannot be resolved within 45 days after delivery of the Closing Date Balance Sheet, arbitration, according to CAE, is to occur. Five days after the arbitrator delivers his determination, the Supplemental Closing occurs, and CAE is to receive its Purchase Price Adjustment by wire transfer.

Also, as previously noted, on August 22, 1988, when the stock purchase Agreement initially closed, it was subject to a post-closing price adjustment (the Purchase Price Adjustment). The total amount of funds transferred to Singer was $560,000,000, which was the sum of $550,000,000, plus the difference between (i) the Estimated Tangible Net Investment ($229,500,000) and (ii) the Tangible Net Investment ($214,500,000)—$15,000,000; and less (iii) CAE's $5,000,000 Holdback (Caldwell Aff., paragraphs 4–5).

### Discussion

### I. Plaintiffs' Motion To Compel Arbitration

Although, as plaintiffs allege, defendants did not furnish plaintiffs with an audited Closing Date Balance Sheet, plaintiffs nevertheless urge the court to compel arbitration of their objections to defendants' unaudited statement pursuant to Section 4 of the United States Arbitration Act (the "FAA").[2] Defendants maintain that the parties did not agree to arbitrate the principal matters in dispute, and that judicial resolution of those principal disputes will render unnecessary resolution of any mat-

ters properly within the scope of Section 1.03(b)(iv).

Section 1.03(b)(iv), part of the Purchase Price and Payment Section, reads:

If such dispute cannot be resolved by Buyer and Seller within forty-five (45) days after the delivery of the Closing Date Balance Sheet, then the specific matters in dispute shall be submitted to an independent accounting firm mutually agreeable to Buyer and Seller. Such accounting firm shall send its written determination to Buyer and Seller and the Supplemental Closing shall take place five (5) business days following the receipt of such determination by Seller. The fees and expenses of the accounting firm referred to in this Section 1.03(b)(iv) shall be paid one-half by Buyer and one-half by Seller.

Defendants claim that the above section of the Agreement encompasses only a narrow class of claims and designates a decision maker with a particular field of expertise—accounting. Plaintiffs advise that they are not seeking to have all of their claims in this action submitted to arbitration. Plaintiffs claim that they seek arbitration of only those items in the unaudited Closing Date Balance Sheet to which they have objections. Plaintiffs further claim that they have furnished defendants with these objections, but defendants have refused to agree upon a mutually chosen independent accounting firm.

This court finds and concludes that arbitration is required by the Agreement and that defendants do not deny the making of the agreement to arbitrate. However, the agreement lacks the specific method by which to proceed.

The language of the FAA makes clear that in the absence of a ground for revoca-

---

**2.** Section 4 of the FAA provides, in pertinent part, that:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court.... The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

9 U.S.C. Section 4.

tion of the contractual agreement, agreements to arbitrate must be enforced.[3]

> [T]he Arbitration Act requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums.

*Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 217, 105 S.Ct. 1238, 1240, 84 L.Ed.2d 158 (1985). Where the parties bargained for arbitration, their agreement must be enforced under the Act. Arbitration should be compelled "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers of America v. Warrior and Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960); *McAllister Bros. v. A & S Transp. Co., Inc.,* 621 F.2d 519, 522 (2d Cir.1980).

■ In determining whether to compel arbitration, this court must first make a "threshold inquiry" as to whether "the contract's arbitration provisions arguably cover the dispute at hand." *McAllister Bros. v. A & S Transp. Co., Inc.,* 621 F.2d 519, 522 (2d Cir.1980); *see Prudential Lines, Inc. v. Exxon Corp.,* 704 F.2d 59, 63 (2d Cir.1983) ("under Section 4, it must be established that: (1) an arbitration agreement exists; (2) the dispute falls within the scope of the arbitration agreement ... and (3) the dispute does not involve the making of the agreement or the failure to comply therewith").

The court must determine whether the dispute between the parties is covered by the arbitration agreement. *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); *Prudential Lines, Inc. v. Exxon Corp.,* 704 F.2d 59 (2d Cir.1983); *Rochdale Village, Inc. v. Public Serv. Emp.,* 605 F.2d 1290, 1294 (2d Cir.1979); *Necchi v. Necchi Sewing Mach. Sales Corp.,* 348 F.2d 693, 696 (2d Cir. 1965), *cert. denied,* 383 U.S. 909, 86 S.Ct.

892, 15 L.Ed.2d 664 (1966). The federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act, must be followed here. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration ..." *Id.* at 24, 103 S.Ct. at 941; *See McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.,* 858 F.2d 825 (2d Cir.1988).

The Second Circuit has distinguished between "broad" and "narrow" clauses in construing arbitration passages. "Broad" clauses purport to refer all disputes arising out of a contract to arbitration, while "narrow" clauses restrict arbitration to particular kinds of disputes. *Id.* at 832; *Prudential Lines,* 704 F.2d at 63–64.

The arbitration clause in Section 1.03 of the Agreement, which requires that "any objections Buyer may have to any of the matters set forth" in the Closing Date Balance Sheet "be submitted to an independent accounting firm" is narrow in scope. *See Gelco Corp. v. Baker Indus., Inc.,* 779 F.2d 26, 27–28 (8th Cir.1985); *Singer Co. v. Tappan Co.,* 403 F.Supp. 322 (D.N.J.1975), *aff'd mem.,* 544 F.2d 513 (3d Cir.1976); *See also Twin City Monorail, Inc. v. Robbins & Myers Inc.,* 728 F.2d 1069, 1074 (8th Cir.1984).

■ The agreement does not explicitly provide for the appointment of an arbitrator. However, Title 9, U.S.C., Section 5 provides the method by which the court is to proceed in instances such as this:

> If in the agreement provision be made for a method of naming or appointing an arbitrator ... such method shall be followed; but if no method be provided therein ... or if for any other reason there shall be a lapse in the naming of an arbitrator ... then upon the application

---

**3.** 9 U.S.C. Section 2 provides that written agreements to arbitrate controversies arising out of an existing contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract".

of either party to the controversy the court *shall* designate and appoint an arbitrator ... and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

Thus, in the absence of an explicit provision in the Agreement, or if for any other reason there shall be a lapse in the naming of an arbitrator, Title 9, U.S.C., Section 5 authorizes this court to appoint an arbitrator which it will do pursuant to an order accompanying this opinion. *See Neptune Maritime, Ltd. v. H & J Isbrandtsen, Ltd.,* 559 F.Supp. 531 (S.D.N.Y.1983); *See also Ore & Chem. Corp. v. Stinnes Interoil, Inc.,* 611 F.Supp. 237, 240–41 (S.D.N.Y. 1985).

Defendants have offered no explanation other than that which has been set forth above for their refusal to cooperate with plaintiffs in naming an independent auditor. The court finds that defendants' claims with respect to arbitration have been wholly frivolous and that the parties should be directed to proceed to arbitration.

## II. Plaintiffs' Motion to Enjoin Defendants From Proceeding in Florida

■ The law in the Second Circuit speaks clearly to the plaintiffs' motion to enjoin the Florida actions. As succinctly stated in *Meeropol v. Nizer,* 505 F.2d 232, 235 (2d Cir.1974):

> Where an action is brought in one federal district court and a later action embracing the same issue is brought in another federal court, the first court has jurisdiction to enjoin the prosecution of the second action.

*See National Equipment Rental, Ltd. v. Fowler,* 287 F.2d 43 (2d Cir.1961). Moreover, it should be noted that defendants' Florida complaints are almost identical to the complaint filed by plaintiffs in this court.[4] The word for word similarity between the complaints in this action and the Florida actions casts doubt on the intent and motives of defendants (in this court) in

filing an action in the United States district court in Florida.

Further, it must be pointed out that the complaints in the two Florida actions are strikingly similar to one another. The only differences appear to relate to jurisdictional and procedural allegations required by the different courts in which each complaint was filed.

This court is empowered to enjoin defendants from proceeding with a subsequently filed action, although the court in the latter action did not stay proceedings. *National Equipment Rental, Ltd. v. Fowler,* 287 F.2d 43, 45 (2d Cir.1961); *See Weight Watchers Int'l, Inc. v. The Stouffer Corp.,* Slip. Op., No. 88 Civ. 7062, 1989 WL 73292 (S.D.N.Y., June 28, 1989), at p. 7. Because the action in the Florida federal court, subsequently filed, is virtually identical to the action before this court, defendants will be enjoined from proceeding further in the Florida federal court where their actions are presently pending.

## III. Plaintiffs' Motion For a Letter of Credit From the Defendants

■ Plaintiffs request that pursuant to Singer's Guarantee, dated July 8, 1988, the court compel Singer to provide CAE with a letter of credit. Plaintiffs rely upon the first two paragraphs of Singer's Guarantee, in which plaintiffs believe that Singer unconditionally guarantees "all liabilities and obligations of ... Aerospace Holdings Company ... under or arising out of the Agreement...." and covenants that:

> it shall not ... make a distribution which would cause its net worth to drop below $100,000,000 within twenty-four months after the Closing Date [August 22, 1988]; provided, however, that [Singer] may ... make such distribution within such period if [Singer] provides ... as security for [Singer's] obligations hereunder, an irrevocable letter of credit naming [CAE] as beneficiary thereunder, with face amount to be mutually agreed and with a term equal to the period commencing

---

**4.** The Florida complaints appear to be copied substantially word for word from plaintiffs' complaint filed in this action, except for the fraud claims. See Supp. Hoffman Affidavit, paragraphs 5–8.

from the effective date of such ... distribution through and including the date which is twenty-four months after the Closing Date.... The obligations of [Singer] under this Guarantee may be enforced directly against [Singer] without notice of default to [Aerospace], and without regard to any choice of remedy which may be selected ...

Plaintiffs argue that the above provisions were designed to protect CAE in two ways: Singer guarantees payment or performance of Aerospace's liabilities and obligations once they have arisen, pursuant to the first paragraph; in the second paragraph, Singer agrees to provide CAE with an irrevocable letter of credit, as security for its obligations as Guarantor, if and when Singer's net worth falls below $100,-000,000 at any time within twenty-four months of the Closing Date. Plaintiffs contend that Singer's net worth has fallen below $100,000,000, and that Singer has made distributions to other parties without providing CAE with a letter of credit for which they had bargained. (Caldwell Aff. Paragraph 15.) In support of its contention, plaintiffs have furnished the court with Singer's most recent 10Q Report, filed with the SEC for the quarter ended June 30, 1989. (Plaintiffs' Exhibit 3) Defendants have not furnished anything to dispute the 10Q Report's figures showing Singer's net worth to be $56,300,000. (Plaintiffs' Exhibit 3 at page 3)

Plaintiffs believe that whether viewed as an action for specific enforcement of the Singer Guarantee, or as mandatory injunctive relief, CAE is entitled to an order directing Singer to provide a letter of credit in an amount equivalent to the amount by which Singer's net worth has been reduced below $100,000,000, as the parties have agreed. Singer has failed and refused to agree to the amount required to bring Singer's net worth up to $100,000,000.

Defendants argue that plaintiffs' motion to compel a letter of credit should be denied because the conditions precedent to Singer's obligation to provide a letter of credit have not occurred. According to defendants, plaintiffs have misconstrued the Guarantee's provision at issue, and have offered a misleading interpretation of the three page Guarantee Singer provided with respect to the July 8, 1988 Purchase Agreement (Caldwell Aff., Exh. 2).

While plaintiffs claim that the Guarantee entitles them to have Singer post a letter of credit to the extent its net worth falls below $100,000,000, defendants argue that the Guarantee does not say that Singer's net worth may not fall below $100,000,000 and that it was not intended to so say. Defendants rely on the following portion of the Guarantee to delineate Singer's obligations to plaintiffs:

shall not ... make a distribution which would cause its net worth to drop below $100,000,000 within twenty-four months after [August 22, 1988] ... [unless Singer] provides ... an irrevocable letter of credit [in CAE's favor] with a face amount to be mutually agreed ...

(Caldwell Aff., Exh. 2, pgs. 1–2)

Defendants argue that the purpose of this clause is directed toward ensuring that the Singer partnership would be restricted from selling Singer's assets and distributing the proceeds to itself before determination and payment of amounts that might be due CAE under the price adjustment mechanism. Singer maintains that pursuant to this construction of the Guarantee, no letter of credit is due since no distributions have been made to the partnership. The court finds that defendants' contention is contrary to the plain unambiguous wording of the Guarantee which encompasses any distribution without limitation.

Defendants also maintain that the letter of credit provision of the Guarantee, which requires an irrevocable letter of credit in an "amount to be mutually agreed", is an unenforceable "agreement to agree." Plaintiffs assert that Singer is attempting to escape its letter of credit obligations under the Guarantee with such an argument. This court agrees; the court finds that the "agreement to agree" language is not so vague as to be unenforceable within the contemplation of the contract law cases cited by defendants. *Joseph Marlin Jr. Delicatessen v. Schumacher*, 52 N.Y.2d

105, 436 N.Y.S.2d 247, 249, 417 N.E.2d 541, 543 (1981). Accord, *Candid Productions, Inc. v. International Skating Union,* 530 F.Supp. 1330, 1333–34 (S.D.N.Y.1982) (Weinfeld, J.).

The Guarantee provides that it is to be governed by New York law. As defendants point out, under New York law, for an agreement to be enforceable, it must contain a complete statement of the material terms of the parties' agreement. Here the Guarantee provided that Singer would provide CAE with an irrevocable letter of credit "with face amount to be mutually agreed." However, as plaintiffs note, contracts containing open terms will be found enforceable if there is any discernible method or basis for filling the gap, *See In the Matter of Leo K. McManus,* 55 N.Y.2d 855, 432 N.E.2d 601, 447 N.Y.S.2d 708 (1982), such as where the parties have included a practicable method to determine an open price term. *Metro–Goldwyn–Mayer, Inc. v. Scheider,* 40 N.Y.2d 1069, 360 N.E.2d 930, 392 N.Y.S.2d 252 (1976). The fact that the amount of the letter of credit was to be determined by the difference between $100,000,000 and Singer's net worth at any given time within twenty four months after the Closing Date is just such a practicable method by which the gap can be readily filled by the simple subtraction of the present net worth of Singer from $100,000,000. The court also finds the argument put forth by defendants with respect to the Guarantee to be wholly frivolous.

The court also finds, contrary to defendants' claim, that at the time the Guarantee was entered into plaintiffs were not aware that Singer's net worth was then below $100,000,000. Plaintiffs were relying, as they well might, on the net worth statement then *available* which showed Singer's net worth as being in excess of $600,000,-000. Defendants have offered nothing to the contrary, except its June 30th balance sheet—the last balance sheet preceding the July eighth sale to CAE—showing a net worth of $78,100,000 to refute plaintiffs' assertion that the only *available* balance sheet on July 8, 1988 was the one referred to by plaintiffs. An order will, therefore,

issue directing defendants to provide a letter of credit in an amount which represents the difference between the present net worth as set forth in plaintiffs' Exhibit 3 and $100,000,000.

In accordance with the suggestion of defendants' counsel (Transcript dated October 10, 1989 at page 17), and pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiffs' present motion to obtain a letter of credit will be treated as a motion for summary judgment. The court finds that there are no genuine issues of material fact in dispute at this time as to plaintiffs' entitlement to the irrevocable letter of credit sought by them.